ANGELICA BALABANOFF, Appellant, *v.* HEARST CONSOLIDATED PUBLICATIONS, INC., Respondent, et al., Defendants.

Submitted May 15, 1945; decided July 19, 1945.

*Otto A. Samuels* and *S. Sidney Heller* for appellant. I. The article is libelous per se. (*People ex rel. Bryant* v. *Zimmerman,* 213 App. Div. 414, 241 N. Y. 405; *Gardner* v. *Home Life Publications, Inc.,* 237 App. Div. 200; *Wulfsohn* v. *Russian Republic,* 234 N. Y. 372; *Sokoloff* v. *National City Bank,* 239 N. Y. 158; *Russian Republic* v. *Cibrario,* 235 N. Y. 255; *Nankivel* v. *Omsk All Russian Government,* 237 N. Y. 150; *Russian Reinsurance Co.* v. *Stoddard,* 240 N. Y. 149; *Hays* v. *American Defense Society,* 252 N. Y. 266; *Corrigan* v. *Bobbs-Merrill Co.,* 228 N. Y. 58.) II. If the article is capable of a meaning which is defamatory or one which is innocent, it is a question for the jury whether it was uttered and understood in its libelous rather than its harmless significance. (*Demos* v. *N. Y. E. J. Publishing Co.,* 210 N. Y. 13; *Breen* v. *New York Herald Co.,* 55 Misc. 567; *Cassidy* v. *Gannett Co., Inc.,* 173 Misc. 634; *Turrill* v. *Dolloway,* 17 Wend. 426.) III. The charge is much more than that plaintiff was an officer of a department or agency of a foreign government. (*Washington Times Co.* v. *Murray,* 55 App. D. C. 32.)

*Charles Henry* for respondent. I. The publication is not libelous in that it merely charges plaintiff with holding a public office which, so far as appears from the complaint, she had a right to hold. (*Crashley* v. *Press Publishing Co.,* 179 N. Y. 27; *Connelly* v. *McKay,* 176 Misc. 685; *Hallock* v. *Miller,* 2 Barb. 630.) II. Special damage must be alleged when a defamatory meaning depends on facts extraneous to the publication itself. (*O'Connell* v. *Press Publishing Co.,* 214 N. Y. 352; *Kuhn* v. *Veloz,* 162 Misc. 948; *Brodek* v. *Jones,* 212 App. Div. 247; *Tower* v. *Crosby,* 214 App. Div. 392; *Werstein* v. *Postal Telegraph-Cable Co.,* 131 Misc. 763; *Cortright* v. *Anderson,* 208 App. Div. 1; *National Variety Artists, Inc.,* v. *Mosconi,* 169 Misc. 982; *Gates* v. *New York Recorder Co.,* 155 N. Y. 228; *Sydney* v. *MacFadden Newspaper Pub. Corp.,* 242 N. Y. 208; *Braun* v. *Armour & Co.,* 254 N. Y. 514.)

DYE, J. The order of Special Term denying a motion to dismiss the complaint has been reversed by the Appellate Division, Second Department, as a matter of law, and is now before us on the question of whether the complaint states a cause of action.

The words complained of appeared in an article published by the defendant in the July 26, 1943, issue of its newspaper, *New York Journal-American,* as follows: " Mussolini found haven in Lausanne and a job sweeping out the Cafe le Lion d'Or, hangout for Russian revolutionaries, then headed by Angelica Balabanoff, who was later to become secretary to the dread Cheka."

In brief, the complaint alleges: that the plaintiff is the same person referred to as Angelica Balabanoff; that the publication was willful; that the subject matter was false and untrue; that the plaintiff was a person of good repute and is widely known as a writer, lecturer and translator, earning her livelihood therefrom; that, before, during and after the 1914–1918 World War, she held highly respectable and envied positions of trust and confidence throughout Europe and was well known by a large number of persons throughout the world and enjoyed their respect and esteem; that the plaintiff has never headed or belonged to any department or organization which summarily arrested, judged and executed people or which was known as either the " Cheka " or " Extraordinary Commission ", but that, on the contrary, the plaintiff has ever been known as being highly critical of, and opposed to, the methods of such " Cheka " or " Extraordinary Commission ", all of which the defendant knew or could have readily ascertained prior to the publication of the article in question.

The complaint further alleges that prior to the publication of the subject matter " the defendants and the public generally knew and understood that the word CHE-KA was formed from the initials of the Russian words ' Extraordinary Commission '; that the Cheka department was organized in Russia in December, 1917 to deal with sabotage and other ' Counter-Revolutionary ' manifestations and to crush opposition at any price; that as internal difficulties increased in Russia its activities were extended to cover speculation, smuggling, and political and military counter-espionage; that its power grew, accordingly, to include summary arrest, judgment, and execution and it was

thus ready to conduct the Terror; that on August 30, 1918, a member of the Social Revolutionary party shot and wounded Lenin; that on the following day Uritzky, chief of the Petrograd Cheka, was shot dead by the Social Revolutionaries; that in revenge for the wounding of Lenin, five hundred of the most prominent figures of the old regime were shot that night in Moscow; that the killing of Uritzky led to similar reprisals in Petrograd; that Latsis, a high official of the Cheka, defined the principles of the Red Terror, which could be summed up in two phrases: ' Strike Quick! ' and ' Strike Hard! '; that ' Strike Secretly! ' could be added for arrests were carried out at night, and families of prisoners were rarely given news of them until they were condemned or freed; that the very name ' Cheka ' became a word of terror, and rumor fantastically exaggerated the number of its agents and its victims; that it spread terror among all classes of people and was not subject to any constitutional control; that its officers and leaders were looked at askance, with distrust, apprehension, contumely, scorn, fear, resentment and vengence; that it was continued until its substitution by a state political administration (Gosudarstvennoye Polititsekoe Upravleniye) popularly known as G. P. U. (gay-payu) which was organized in its stead and to take its place, afterwards known as O. G. P. U. (ogpu) (the ' O ' signifying unified after the 1923 formation of the U. S. S. R.).''

The complaint also contains allegations, in substance, that by reason of the publication of the subject article the plaintiff has been brought into public scorn and disgrace and there has been falsely created a suspicion and belief that the plaintiff, in her private and professional life, has participated in and committed vile, scandalous and shameful acts of misconduct, and that by reason of such publication she has been damaged in the sum of $50,000.

Concededly, the plaintiff has alleged no special damage. This, however, is not fatal as it is well established that a complaint in a libel action is sufficient if the false publication complained of is libelous per se. (*Sydney* v. *Macfadden Newspaper Pub. Corp.*, 242 N. Y. 208; *O'Connell* v. *Press Publishing Co.*, 214 N. Y. 352.)

The test applicable to the sufficiency of the complaint narrows down then to the single proposition of whether the publication

complained of is libelous per se. The defendant, in support of its contention that the publication is not libelous per se, argues that, although the " Cheka " was everything the complaint alleged, it was, nevertheless, a legally constituted instrumentality of the Russian Government and, as such, presumably performed its functions in a lawful manner through its duly authorized officers and agents; that the statement that plaintiff was an officer of the " Cheka ", which so far as appears from the complaint she had a right to be, is not tantamount to charging her with the commission of a crime or other misconduct; and that, under such circumstances, there can be no libel regardless of how good her reputation was or how false the publication, particularly as there is no allegation that she was not a Russian citizen. This line of reasoning seems to be predicated on the general proposition that an article is not libelous per se if the act complained of is not illegal in the country where committed. (*Crashley* v. *Press Publishing Co.*, 179 N. Y. 27.)

The article in question goes much further than merely charging appellant with having been an officer or agent of a foreign government. She is charged with association with Mussolini in a hangout for Russian revolutionaries, headed by her, as well as later becoming secretary to the dread " Cheka ". In Restatement of the Law of Torts, section 563, subdivision d, it is stated: " In determining the meaning of a communication, words, whether written or spoken, are to be construed together with their context. Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. So too, words which alone are innocent may in their context clearly be capable of a defamatory meaning and may be so understood. The context of a defamatory imputation includes all parts of the communication which are ordinarily heard or read with it."

The allegations of the complaint describing the organization, functions and practices of the " Cheka " are essential to an understanding of the significance of the language of the subject publication and do not, in our opinion, constitute extrinsic facts of such a character as to necessitate allegations of special damage.

Given a fair reading, we feel that the article in question, taken in its entirety, fairly raises a question as to whether the plaintiff was held up to public contempt and disgrace; and, if so found, such an article is libelous per se without alleging special damages. (*Hays* v. *American Defense Society*, 252 N. Y. 266; *Kimmerle* v. *New York Evening Journal, Inc.*, 262 N. Y. 99.)

In *Katapodis* v. *Brooklyn Spectator, Inc.* (287 N. Y. 17, 20), in which a newspaper article describing the poverty of the plaintiff was held libelous per se, LOUGHRAN, J. said: "The reason is that in libel the matter is defamatory not only if it brings a party into hatred, ridicule or contempt by asserting some moral discredit upon his part, but also if it tends to make him be shunned or avoided, although it imputes no moral turpitude to him."

Whether the false publication in the instant case, in and of itself, is sufficient to bring the plaintiff into disrepute and subject her to the hatred and contempt of her friends and associates is a matter within the province of the jury, and we are unwilling to say, as a matter of law, that the language used is not libelous per se.

The judgment of the Appellate Division should be reversed and the order of the Special Term affirmed, with costs in this court and in the Appellate Division.

LEHMAN, Ch. J., LOUGHRAN, LEWIS, CONWAY, DESMOND and THACHER, JJ., concur.

Judgment accordingly.