REMINGTON v. BENTLEY et al.

United States District Court
S. D. New York.
Dec. 7, 1949.

Richard G. Green, New York City, attorney for plaintiff, Rauh & Levy, Washington, D. C., of counsel.

Coudert Brothers, New York City, attorneys for defendants National Broadcasting Company, Inc. and General Foods Corporation, Walter R. Barry, New York City, Alexis C. Coudert, New York City, of counsel.

Pruitt, Desvernine & Coursen, New York City, attorneys for defendant Elizabeth T. Bentley.

CONGER, District Judge.

The defendants' motion to dismiss the complaint under Rule 12(b) (6) of the Federal Rules of Civil Procedure, 28 U.S. C.A., presents problems in connection with the application of the laws of slander and libel to the medium of television.

The complaint alleges that the plaintiff, an economist by profession has been, since May, 1940, an employee of the United States Government in various capacities; that in assuming his positions he was required to, and did take an oath that he did not belong to any organization which advocated the overthrow of the Government by force and violence; that the Attorney General of the United States has consistently ruled that the Communist Party was such an organization.

The complaint further alleges that the plaintiff is not and never has been a Communist nor a member of the Party, nor a Communist sympathizer, of which facts the defendants knew or should have known at the time of the remarks in controversy.

The complaint further alleges that on July 30, 1948, the defendant Bentley testified before a Senate Sub-Committee, among other things, that she had joined the Communist Party in 1935 and had remained a member for approximately ten years; that she had acted as a spy for the Party, realizing that information obtained was going to the Soviet Government; that using a fictitious name and hiding her true identity, she obtained confidential information from the plaintiff in his capacity as an employee of the United States Government; and that plaintiff was a member of the Communist Party.

The complaint alleges that the plaintiff denied under oath the charges made by the defendant Bentley before the same Sub-Committee on July 31 and August 3, 1948, and his denials were widely publicized prior to September 12, 1948.

On the evening of September 12, 1948, it is alleged, the defendant Bentley appeared on a certain television broadcast known as "Meet the Press", which program was sponsored by the defendant General Foods Corporation and was broadcast over the several stations of the television network of the defendant National Broadcasting Company, Inc., including WNBT-TV, New York, and WNBW-TV, Washington and other stations in the United States, and the program was seen and heard by hundreds of thousands of persons; that in the course of the program, the defendant Bentley repeated the charge that she had made before the Senate Sub-Committee by the following statements in answer to the following questions:

"Question: May I ask you one more question?

"Bentley: Yes, go ahead, Mr. Brown.

"Question: That is this Miss Bentley: you've made charges in your testimony before a Congressional Committee naming several people as communists. Now knowing very well here, Miss Bentley, you don't have Congressional immunity, would you now identify William Remington as a communist, or Alger Hiss, or anyone else that you've named?—Knowing that you might open your way to a libel suit?

"Bentley: Yes, I would certainly do that, but as long as I am under subpoena from a committee, I don't believe that I should go talking about these various matters until the committee has completed its hearings.

"Question: Well, you are talking about the matters here and you've named these people as communists and I wish you'd do it out in the open.

"Bentley: Certainly.

"Question: Will you now name William Remington as a communist?

"Bentley: Certainly, I testified before the committee that William Remington was a communist.

"Question: And do you say that here and now?

"Bentley: Yes, I said that before the committee and I would certainly repeat my testimony before the committee.

"Question: And will you repeat here and now that William Remington is a communist? Is that your charge? Did you make it—?

"Bentley: I told you that I had. I told you that I testified before the committee that he was a communist * * *

"Question: Yes * * *

"Bentley: A member of the Communist Party."

The complaint further alleges that such program was permanently recorded in writing, on phonograph records and otherwise by the corporate defendants and others; that her statements were intended to and did convey the meaning that plaintiff was and is a member of the Communist Party, and was such while an employee of the Government, contrary to his oaths, his testimony before the Sub-Committee and the laws of the United States; that the corporate defendants knew or should have known that defamatory remarks might result from the program and that such remarks would be broadcast and telecast to a great number of persons; that the very purpose of scheduling the appearance of the defendant Bentley was to obtain sensational statements from her interview; that the statements are untrue, false and defamatory of plaintiff as an economist and employee of the Government, and have greatly injured him and damaged him in his employment and in his profession.

The complaint demands judgment in the sum of $100,000.

Specifically, the defendants' objections are twofold: [1] that the broadcast of extemporaneous defamatory matter constitutes slander; and the statements attributed to the defendant Bentley, not being slanderous *per se*, are not actionable without proof of special damage; and [2] that the statements were privileged as an accurate report of testimony before a Congressional Committee.

Historically, the distinction between libel and slander has rested upon the manner of expression. Libel consisted of defamation by writing while slander found its basis in the spoken word. The companion torts have existed side by side in this fashion ever since the common law courts succeeded to the jurisdiction of the Star Chamber in 1641. Previously, libel had been a crime, a development of the Star Chamber growing out of its jurisdiction over printing. When the common law courts took over, the offense became a common law misdemeanor; the wrong a tort. In 1670, libel, as distinguished from slander over which the common law courts had assumed jurisdiction since the reign of Henry VIII, was held to be a wrongful act *per se,* damage being presumed. "This view was subsequently followed by Hold and Hardwicke, and was finally settled in 1812 on the ground that the doctrine, although indefensible in principle, was too well established to be repudiated. A generation later a committee of the leading English judges of the day advised Parliament on certain methods of reforming the law of defamation. Among other things they recommended the abolition of the distinction in form 'which rests upon no solid foundation'. And there it still rests." See Restatement of the Law of Torts, Historical Note to § 568, pp. 159-162, 162.

And so today slander is tortious if the oral defamation falls within certain classes of cases which are actionable *per se* or if it causes special damage, while libel is actionable by itself.

It is this distinction upon which the defendants base the initial ground of their motion.

In Hartman v. Winchell, 296 N.Y. 296, 73 N.E.2d 30, 171 A.L.R. 759, the Court of Appeals held that the broadcast of defamatory matter read from a script constitutes libel, but the Court expressly stated that it was not required to pass upon the question "whether broadcasting defamatory matter which has not been reduced to writing

should be held to be libellous." 296 N.Y. at page 300, 73 N.E.2d at page 32.

Prior to this decision, however, the point was considered in Locke v. Gibbons, Supreme Court, N. Y. County, Special Term, 164 Misc. 877, 299 N.Y.S. 188, affirmed 253 App.Div. 887, 2 N.Y.S.2d 1015, and there Mr. Justice Pecora held that extemporaneous defamatory matter not contained in a script was slander. Compare Locke v. Benton & Bowles, Inc., 253 App.Div. 369, 2 N.Y.S.2d 150, where the Appellate Division found it unnecessary to determine whether the same matter involved in the Gibbons case was slander or libel, the Court remarking that it would be actionable in any event if it injured the plaintiff in his work. Actually, the case was decided on a question of pleading, the alleged defamatory remarks not having been set forth in the complaint.

■ The defendants assert that the analogy between broadcasting and the method of publication in suit is valid, and therefore that precedent requires that the statements be deemed slanderous. I accept the analogy to the extent that it applies to extemporaneous oral expression, and I feel that the additional factor of pictorial representation along with the statements adds no more to the form of defamation than would the circumstance of a great audience in a stadium or the like listening to the spoken word. I adopt this view keeping in mind and in spite of the fact that defamation in motion pictures has been treated as libel. See Brown v. Paramount Publix Corp., 240 App.Div. 520, 270 N.Y.S. 544; Youssopoff v. Metro-Goldwyn-Mayer, 50 Times L.R. 581, 99 A.L.R. 864 [English Court of Appeal].

If the age-old difference between libel and slander is to be maintained, as an adherence to precedent compels, then it seems to me that the rule as set forth by Mr. Justice Cardozo in Ostrowe v. Lee, 256 N.Y. 36, at page 39, 175 N.E. 505, 506, is most pertinent to the question at issue.

"The schism in the law of defamation between the older wrong of slander and the newer one of libel is not the product of mere accident, Veeder, The History of the Law of Defamation, vol. 3, Essays in Anglo-American Legal History, 459, 461, 467, 468, 471; Fisher, The History of the Law of Libel, 10 Law Quarterly Review, 158; 1 Street, Foundations of Legal Liability, pp. 291, 292; 8 Holdsworth, History of English Law, p. 365. It has its genesis in evils which the years have not erased. Many things that are defamatory may be said with impunity through the medium of speech. Not so, however, when speech is caught upon the wing and transmuted into print. What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and 'perpetuates the scandal.' Harman and Delany, Fitzgibbon, 253, 254; Veeder, supra, p. 472; Street, supra, p. 294."

■ Generally, slander is actionable without a showing of special damage if the publication imputes a crime, a loathsome disease, or some conduct, condition or trait tending to injure another in his trade or profession. See Seelman, The Law of Libel and Slander, p. 599 et seq.; Restatement, supra, p. 170.

The complaint charges that the defendant Bentley's statements imputed various crimes to the plaintiff; and in his brief the plaintiff points out that the accusation, if true, would subject him to prosecution for violation of § 1001 of Title 18 of the New United States Code Annotated which makes it a crime with dire punishment to state falsely in any matter within the jurisdiction of any department or agency of the United States Government; for violation of § 1621 of Title 18 of the New Code relating to perjury in connection with his testimony before the Sub-Committee; for violation of the Hatch Act, 5 U.S.C.A. § 118(j), with respect to membership of Federal employees in any political party or organization advocating the overthrow of our constitutional form of Government; and for violation of the Smith Act, 18 U.S.C.A. § 2385, which interdicts advocacy of the overthrow of the Government by force and violence.

The defendants assert that none of the facts showing the commission of a crime were contained in the remarks of the de-

fendant Bentley; and they argue that the case is, therefore, one of defamation by extrinsic fact supplied by the pleading, under which circumstances special damages must be pleaded, citing for the proposition O'Connell v. Press Publishing Co., 214 N.Y. 352, 108 N.E. 556.

The O'Connell case involved an article in a newspaper concerning weighing trickery and crooked scales in the sugar business, in which the plaintiff was referred to as the inventor of a corset steel spring device which was shown by the plaintiff to an official of an organization charged with weighing frauds, which official referred plaintiff to a superintendent who was on trial for like frauds at the time of publication. The Court of Appeals held that the publication, not libellous upon its face, was only so by reason of facts extrinsic to it; and that in such cases the damages flowing from the publication must be specifically set forth in the complaint.

■ The O'Connell case appears to be the subject of some controversy. A text writer has denounced it as unsound, pointing out that it has not been followed by the Court of Appeals in subsequent decisions to which it was applicable.[1] But it has been cited both in the lower Courts and in the Court of Appeals[2] as recently as 1945 in Balabanoff v. Hearst Consolidated Publications, 294 N.Y. 351, 62 N.E.2d 599. In fact the Court there remarked that "The allegations of the complaint * * * do not, in our opinion, constitute extrinsic facts of such a character *as to necessitate allegations of special damage.*" 294 N.Y. at page 355, 62 N.E.2d at page 601. [Emphasis added.] It may be noted that the foregoing cases all concern libel but the principles are equally applicable to slander by extrinsic fact.

Plaintiff urges that the facts indicating the commission of a crime are not extrinsic within the meaning of the O'Connell case.

In this I must disagree. If there were on the statute books a law which stated that it was a crime to be a Communist, then of course the defendant's remarks would accuse plaintiff of the commission of a crime. However, there being no such statute, it is necessary to prove by extrinsic facts that plaintiff took an oath that he was not a Communist, or that he swore before a certain legislative body that he was not a Communist. The crime is in the false oath.

■ However, the complaint as heretofore indicated, charges that the defendant Bentley's statements have greatly injured and damaged the plaintiff in his employment and profession. A slanderous statement affecting one in this respect has always been actionable *per se*. Section 573 of the Restatement, supra, puts it this way:

"One who falsely and without a privilege to do so, publishes a slander which ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, profession, or of his public office whether honorary or for profit, is liable to the other."

The defendants argue that the words must be spoken in relation to plaintiff's occupation and must be peculiarly injurious to the plaintiff because of his particular calling. And they assert that the words complained of, if defamatory, are not so because plaintiff is an economist and a Government employee, but would be equally injurious to any reputable citizen whether a lawyer, a teacher, etc.

I know of no accusation more discreditive of a United States Government official with respect to the proper conduct of his office than that he is a Communist. Members of the Communist Party are not permitted to hold office in the Federal Government. Generally, Communists are looked upon as representatives of a foreign Government. Mr. Justice Fuld in Mencher v. Chesley,

1. See Seelman, supra, pp. 34–65.
2. Nolan v. Powell-Savory Corp.,* October 20, 1937; National Variety Artists, Inc., v. Mosconi, 169 Misc. 982, 9 N.Y.S.2d 498; Kuhn v. Veloz, 252 App.Div. 515,

299 N.Y.S. 924, for example; Sydney v. MacFadden Newspaper Pub. Corp., 242 N.Y. 208, 151 N.E. 209, 44 A.L.R. 1419.
* No opinion for publication.

297 N.Y. 94, at page 100, 75 N.E.2d 257, 259 has very well painted the picture:

"Today and in the recent past—whether or not communism stands for violent overthrow of government * * * it is undeniable that for communism and its adherents and sympathizers, there has been widespread public aversion. Evidence of that antipathy is found not only in public opinion polls and in other studies * * * but also in legislation and executive orders enacted and promulgated during the past several years which subject communists and their affiliates and sympathizers to loss of public office and private position and, in some cases, even to deportation proceedings."

Certainly, in accord with present day thinking officers of our Government and the public at large would distrust the honesty, the impartiality and the judgment of an economist in the employ of our Government who was known as a Communist. His usefulness as a public servant would be ended.

In addition, the statement injures plaintiff in his profession as an economist. It is natural to presume that an economist who is a Communist adheres to the economic theories of Communism, which are repugnant to the theories historically accepted in this Country.

█ I do not agree with defendants that a defamation injurious to one in his business or profession must refer to him in his practice of that business or profession. It is not necessary to say that the plaintiff is an unfit Government official or economist because he is a Communist. It is sufficient to charge what he stands for and the relationship is obvious. Comment to § 573 of the Restatement, supra, makes this clear.

"Disparaging words, to be actionable per se under the rule stated in this Section, must affect the plaintiff in some way which is peculiarly harmful to one engaged in his trade or profession. Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession. *It is not necessary that the defamer refer to the other as engaged in the particular profession or calling in question. It is enough if the statement is of a character to be particularly disparaging of one engaged in such an occupation. * * *"* [Emphasis added.] See also Sanderson v. Caldwell, 45 N.Y. 398, 6 Am.Rep. 105.

█ I conclude that the defendant Bentley's remarks are injurious to plaintiff as a Government official and economist and are, therefore, slanderous *per se,* and that special damage need not be alleged.

Finally, the defendants argue that the statements of defendant Bentley were privileged as an accurate report of testimony before a Congressional Committee.

Section 337 of the New York Civil Practice Act as amended provides as follows:

"A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judical, legislative or other public and official proceedings, or for any heading of the report which is a fair and true headnote of the statement published.

This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of the public and official proceedings which was not a part thereof."

Although this section concerns privileges in an action for libel, I assume, as counsel have apparently assumed, that it applies to extemporaneous reports by radio or television.

However, I deem it more judicious to pass this point at this time and let it rest with the trial Judge or some time after the pleadings are complete. It may then be simpler to determine whether defendant Bentley was making a "report" and also whether she waived, by her responses, any privilege she may have had.

Motion denied.

Settle order.