HENRY F. FISCHER, JR., Respondent, *v.* POST-STANDARD COMPANY, Appellant.

Third Department, August 1, 1961.

*John C. Kinney* of counsel (*Bond, Schoeneck & King,* attorneys), for appellant.

*Adam R. Palmer* for respondent.

REYNOLDS, J.  Respondent is the District Attorney of Franklin County and a member of the New York Bar.  On June 13, 1959 appellant, the owner and publisher of " The Post-Standard ", a newspaper published in Syracuse and having a general circulation in New York State including Franklin County, printed an article captioned " D A PULLS ' STAR CHAMBER ' HEARING IN SLAYING ".  The article described the circumstances surrounding the pretrial hearing of a St. Regis Indian accused of killing a State Trooper from which the press and public were legally excluded in accordance with section 203 of the Code of Criminal Procedure.  In addition to the expression " Star Chamber ", police brutality was charged and the phrase " iron curtain " was also used in describing the exclusion of the press and public from the hearing.  Respondent alleges that the article falsely insinuates that he violated the accused's constitutional rights and by so doing injured his professional reputation.  In *Nichols* v. *Item Publishers* (309 N. Y. 596, 600–601) Judge FULD writing for the court set forth the pertinent general rule:  " The general rule, we stated in *Mencher* v. *Chesley* (297 N. Y. 94, 100), is that ' A writing is defamatory — that is, actionable without allegation or proof of special damage — if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him.' And to that listing of the defamatory should be added a writing which tends to disparage a person in the way of his office, profession or trade.  (See, e.g., *Nih* v. *Bolman,* 307 N. Y. 725; *Rager* v. *McCloskey,* 305 N. Y. 75, 79; *Kleeberg* v. *Sipser,* 265 N. Y. 87; *Sanderson* v. *Caldwell,* 45 N. Y. 398, 405; *Potter* v. *New York Evening Journal Pub. Co.,* 68 App. Div. 95, 99.)  The publisher of a libel may not, of course, escape liability by veiling a calumny under artful or ambiguous phrases and, if any common-sense construction of what was written justifies or supports a defamatory meaning, it will be for the jury, not the court on motion, to

decide whether the writing was or was not defamatory. (See *Mencher* v. *Chesley, supra,* 297 N. Y. 94, 102.) '' Appellant contends that it was merely utilizing the well-recognized right of fair comment by the press on matters of public interest (*Hoeppner* v. *Dunkirk Print. Co.,* 254 N. Y. 95; *Briarcliff Lodge Hotel* v. *Citizen-Sentinel Publishers,* 260 N. Y. 106; *Tanzer* v. *Crowley Pub. Corp.,* 240 App. Div. 203), and surprisingly enough that the use of the words '' Star Chamber '', the allusion to police brutality and '' iron curtain '' in the context used could only be reasonably interpreted by the average reasonable man to indicate that the hearing was secret or closed. We are confident that the public's understanding of the meaning of the term '' Star Chamber '' is something quite different than merely a secret or closed meeting. (Cf. 21 New International Encyclopedia [2d ed., 1935] describing '' Star Chamber '' p. 457): '' The form of the proceeding was by written information and interrogatories, except when the accused person confessed, in which case the information and proceedings were oral. Abuses grew out of this; forced confessions, pressure, torture prevailed. Admissions of the most immaterial facts were construed into confessions; and fine, imprisonment, and mutilation were inflicted on a mere oral proceeding, without hearing the accused, by a court consisting of the immediate representatives of prerogative. The proceedings of the Star Chamber had always been viewed with distrust by the commons; but during the reign of Charles I its excesses reached a height that made it absolutely odious to the country at large; '' and Merriam-Webster New International Dictionary (2d ed., 1959, p. 2458) defining '' Star Chamber '': ''Its broad jurisdiction was based on encroachments of the crown, esp. under the Tudors. It could proceed on mere rumor or examine witnesses; it could apply torture. It was abolished by the Long Parliament in 1641. (16 Chas. I, c. 10). Hence, often any secret oppressive or irresponsible tribunal.'' This quotation giving this authoritative connotation of the phrase '' Star Chamber '' is from probably the most outstanding dictionary printed in the English language and was printed in 1959, not years ago.

Therefore, we believe Special Term took the following view with entire justification:

'' To the mind of the court, at least, these expressions refer to a court or a sort of hearing held in secret for the express purpose of enabling the State to deprive an accused of a fair trial; to work the will of the State upon the accused without regard to legal or sufficient evidence and without affording the accused

any of the rights which the development of our legal system has finally accorded to such persons. The expressions have implications of maiming, torture, unjust seizure of property and swift transportation to various unpleasant forms of death.

" * * * it appears to the mind of this court that the defendant was charging the plaintiff with a violation of his oath as a public officer; that he had resorted to means and methods expressly forbidden by the Constitutions of the State and of the United States and that he willfully violated and disregarded all the protection to which an accused is entitled."

A charge that respondent deprived the accused of his constitutional rights would clearly be actionable. The expressions " Star Chamber ", police brutality and " iron curtain " conveying the same meaning would be no less libelous. Since no special damages are alleged the test to be applied is whether the article as a matter of law can be found to be without defamatory import (*Balabanoff* v. *Hearst Cons. Pubs.*, 294 N. Y. 351). In making this determination the whole article or statement must be examined to determine if the allegedly libelous words or phrases have, in fact, a defamatory import (*Tracy* v. *Newsday, Inc.*, 5 N Y 2d 134; *Julian* v. *American Business Consultants*, 2 N Y 2d 1). Even when this is done, however, we cannot say that as used in the instant article that a reasonable man could not conceive that a " Star Chamber " hearing imported an oppressive affair in derogation of the accused's rights. This publication is in our opinion susceptible to defamatory meaning and respondent is entitled to have a jury decide if the allegedly defamatory words were likely to be so understood by the average reader (*Sanderson* v. *Caldwell*, 45 N. Y. 398; *Mencher* v. *Chesley*, 297 N. Y. 94). As stated in *Sanderson* v. *Caldwell* (*supra*, p. 401): " In an action for defamation, if the application or meaning of the words is ambiguous, or the sense in which they were used is uncertain, and they are capable of a construction which would make them actionable, although at the same time an innocent sense can be attributed to them, it is for the jury to determine upon all the circumstances, whether they were applied to the plaintiff, and in what sense they were used."

The order should be affirmed, with $10 costs to respondent.

BERGAN, P. J. (dissenting). It is not easy to see any possibility that this newspaper publication criticizing the District Attorney can be held to be libelous without alleging any specific damage. The article said that on the District Attorney's application the Magistrate excluded from a preliminary exami-

nation into a felony everyone except the specific persons entitled by law to be there.

The Magistrate had the legal right to make such an order on application of the District Attorney or without any application (Code Crim. Pro., § 203). This could not possibly expose the District Attorney to "hatred, contempt or aversion" or tend "to induce an evil or unsavory opinion of him in the minds of a substantial number of the community", in the absence of claiming some specific damage, within the classic definition of libel per se in *Nichols* v. *Item Publishers* (309 N. Y. 596, 600, 601). This is the only sense in which it is possible to read the newspaper article, i.e., that it was a session before an examining Magistrate, in the words of the article, "from which the press and public were barred".

The tone of the article was sharply critical of the method of procedure in conducting the criminal examination. This was a right the press had; and the District Attorney, as a public officer and not a private person, must expect that the right of criticism of his public acts may be freely exercised even though those acts may themselves be quite lawful. This seems one of the unavoidable consequences of a willingness to occupy public office. The descriptive terms used were highly critical, but they were not libelous.

I think that the attribution of sinister implications to such terms of criticism as "star chamber hearing" or "door slamming action" or "closed door hearing" cannot be taken seriously. These terms all meant the same thing—that the examination was secret, as the law permitted it to be. No reasonable person could read these words in context in any other sense, and it is a common modern usage to call secret proceedings "star chamber", whatever that term may have connotated two or three centuries ago.

The term "iron curtain" appeared in the article, but it is a distortion of the publication to say that the term was used to describe the hearing itself, or to imply that it suggested a totalitarian suppression of rights or liberties. That term was used solely to describe a refusal of the Judge, the District Attorney, and defense counsel to discuss the case with a reporter after the hearing; and that is something quite different. In actual context, this is what the article said in this respect: "The Judge and two attorneys built a solid iron curtain around the hearing when they refused to state what transpired at the hearing, or even to name witnesses who had been subpœnaed."

And it is not possible to read this article in the sense which plaintiff argues it should be read as stating an "inability to

perform his ordinary duties of his profession and which imputes to this plaintiff a breach of professional ethics " and " of actions that are not conscionable in view of his oaths of office."

Nor is it possible to read it as charging that " he violated the accused's constitutional rights ". In the first place, the actual decision not to have a public hearing was the decision of the Judge and not that of the plaintiff, as the publication suggests. It is plain that the Magistrate controlled the hearing; the District Attorney was said to have " instituted " the decision to hold it privately. The worst that can be implied against the plaintiff is that he made an application before a Judge which the Judge had the right to grant and which he did grant.

This private preliminary examination into a felony, however much the press may complain about it, is not oppressive or unconstitutional. On the contrary it is the very alternative which the statute gives to the third degree — it is the judicially supervised preliminary investigation to see whether or not enough evidence exists to continue an accused under arrest until a Grand Jury can act. It is a procedure in aid of constitutional rights.

Most penologists agree that it would improve the administration of criminal law if examinations were held before Magistrates immediately after arrest and without police interrogation; and in the nature of things they would have to be held in nonpublic sessions from time to time. Indeed, this is a fair description of the basic theory of Code of Criminal Procedure practice.

The order should be reversed and the complaint dismissed.

GIBSON and HERLIHY, JJ., concur with REYNOLDS, J.; BERGAN, P. J., dissents and votes to reverse and dismiss the complaint in opinion.

Order affirmed, with $10 costs to respondent.