GEORGE W. HARTMANN, Respondent, *v.* WALTER WINCHELL, Appellant.

Argued January 17, 1947; decided April 17, 1947.

*Walter R. Barry* and *Alexis Coudert* for appellant. I. Broadcasting from a written script, if actionable, should be treated as slander rather than as libel. (*Locke* v. *Gibbons,* 164 Misc. 877, 253 App. Div. 887; *Locke* v. *Benton & Bowles, Inc.,* 253 App. Div. 369; *Polakoff* v. *Hill,* 261 App. Div. 777; *Meldrum* v. *Australian Broadcasting Co.,* [1932] Vict. L. R. 425; *Sorenson* v. *Wood,* 123 Neb. 348; *Summit Hotel Co.* v. *National Broadcasting Co.,* 36 Pa. 182; *Ostrowe* v. *Lee,* 256 N. Y. 36; *Hryhorijiv* v. *Winchell,* 180 Misc. 574, 267 App. Div. 817.) II. The words uttered are not actionable as slander per se. (*Kinney* v. *Nash,* 3 N. Y. 177; *Ireland* v. *McGarvish,* 1 Sandf. 155; *Weidberg* v. *La Guardia,* 170 Misc. 374; *Purdy* v. *Rochester Printing Co.,* 96 N. Y. 372; *Oakley* v. *Farrington,* 1 Johns. Cas. 130; *Van Tassel* v. *Capron,* 1 Denio 250; *Moore* v. *Francis,* 121 N. Y. 199.) III. The complaint contains no sufficient allegation of special damage. (*Reporters Assn.* v. *Sun Printing & Publishing Assn.,* 186 N. Y. 437; *Tower* v. *Crosby,* 214 App. Div. 392.) IV. The words were not spoken of plaintiff and are not defamatory. (*Hays* v. *American Defense Society,* 252 N. Y. 266; *Feely* v. *Vitagraph Co.,* 184 App. Div. 527; *O'Connell* v. *Press Publishing Co.,* 214 N. Y. 352; *Burton* v. *Crowell Publishing Co.,* 82 F. 2d 154; *Garriga* v. *Richfield,* 174 Misc. 315; *Levy* v. *Gelber,* 175 Misc. 746.)

*Sigmund Goldstein* for respondent. I. The broadcast matter is libelous per se. (*Cross* v. *Sylvia Silk Co., Inc.,* 222 App. Div. 134; *Danzig* v. *Lacks,* 235 App. Div. 189; *O'Connor* v. *O'Connor,* 263 App. Div. 820; *Balabanoff* v. *Hearst Consolidated Publications,* 294 N. Y. 351.) II. Reading defamatory matter from a prepared script, over the radio, constitutes a libel. (*Hryhorijiv* v. *Winchell,* 180 Misc. 574, 267 App. Div. 817;

*Metropolitan Life Ins. Co.* v. *Knickerbocker Broadcasting Co.,* 172 Misc. 811; *The Mayflower Broadcasting Corp.,* 8 F. C. C. Rep. 333.) III. Holding that reading defamatory matter from a prepared script over the radio is libelous is neither novel nor new. (*Hryhorijiv* v. *Winchell,* 180 Misc. 596, 267 App. Div. 817; *Metropolitan Life Ins. Co.* v. *Knickerbocker Broadcasting Co.,* 172 Misc. 811; *Polakoff* v. *Hill,* 261 App. Div. 777; *Curran* v. *Winchell,* N. Y. L. J., March 13, 1941, p. 1141, col. 2; *King* v. *Winchell,* 248 App. Div. 809; *Merle* v. *Sociological Research Film Corp.,* 166 App. Div. 376; *Brown* v. *Paramount Publix Corp.,* 240 App. Div. 520; *Youssoupoff* v. *Metro-Goldwyn-Mayer Pictures, Ltd.,* 50 Times L. R. 581.) IV. The defamatory matter is libelous per se. In addition plaintiff alleged the loss of his teaching and lecturing position with a loss to him of upwards of $7,000. V. Assuming, *arguendo,* that the broadcast references to plaintiff, read from the prepared script, do not constitute what is commonly termed a libel, nonetheless the complaint states a good cause of action. (*Gale* v. *Ryan,* 263 App. Div. 76.)

THACHER, J. The motion to dismiss the amended complaint, pursuant to rule 106 of the Rules of Civil Practice, was denied, and this determination has been affirmed on appeal to the Appellate Division with leave to appeal to this court upon the following certified questions:

" 1 — Does the utterance of defamatory remarks, read from a script into a radio microphone and broadcast, constitute publication of libel?

" 2 — Does the further amended complaint state facts sufficient to constitute a cause of action? "

The words of the broadcast were defamatory and were spoken of and concerning the plaintiff; they did not, however, defame him in his professional character and were not slanderous per se (*Kleeberg* v. *Sipser,* 265 N. Y. 87, 91; *Moore* v. *Francis,* 121 N. Y. 199, 203; *Kober* v. *Lyle,* 173 App. Div. 655; *Armstrong* v. *Sun Printing & Pub. Assn.,* 137 App. Div. 828, 831–832). Nor is the general allegation that plaintiff " suffered a loss of earnings upwards of seven thousand ($7,000) dollars " sufficiently specific to constitute an allegation of special damage — indispensible if reading from the script was not libel (*Reporters'*

*Assn.* v. *Sun Printing & Pub. Assn.,* 186 N. Y. 437; *Philipp Co.* v. *New Yorker Staats-Zeitung,* 165 App. Div. 377, 390; *King* v. *Sun Printing & Pub. Assn.,* 84 App. Div. 310, affd. 179 N. Y. 600). If it was libel, both questions must be answered in the affirmative; if not, both must be answered in the negative.

In *Snyder* v. *Andrews* (6 Barb. 43 [1849]), it was held that reading a defamatory letter in the presence of a stranger was a sufficient publication to sustain an action for libel (citing *De Libellis Famosis,* 5 Co. Rep. 125a [1605]; *John Lamb's Case,* 9 Co. Rep. 59b [1610]). These decisions in Coke's Reports were cited in *Forrester* v. *Tyrrell* (9 Times L. R. 257 [1893]), where the defendant, in the presence of others, read out an anonymous letter defaming the plaintiff, and Lord ESHER, in announcing the unanimous decision of the Court of Appeal, said: " In ' Anon ' (5 Rep., 125a) and ' John Lamb's Case ' (9 Rep., 60) it was laid down that if a man read a libel on another to himself and then read it out that made him a libeller. It would be strange if it were not so. What was so laid down has been treated as clear law by books of authority ever since, and it showed that the publication here made the defendant a libeller of the plaintiff." There are dicta to the contrary in *Osborn* v. *Thomas Boulter & Son* ([1930] 2 K. B. 226) but that decision went upon a question of privilege, which perhaps explains the fact that *Forrester* v. *Tyrrell* (*supra*) was not mentioned in the opinions of the judges or in the briefs of counsel as summarized by the reporter. By the great weight of authority in other States this rule coming down from Coke's time and declared in *Forrester* v. *Tyrell* (*supra*) is the law today (*M'Coombs* v. *Tuttle,* 5 Blackf. [Ind.] 431; *Bander* v. *Metropolitan Life Ins. Co.,* 313 Mass. 337; *Peterson* v. *Western Union Telegraph Co.,* 72 Minn. 41; *Ohio Public Service Co.* v. *Myers,* 54 Ohio App. 40; *Adams* v. *Lawson,* 17 Grat. [Va.] 250).

We accept *Snyder* v. *Andrews* (*supra*) as a correct statement of the rule which still prevails in this State but it is said that this rule can have no application to radio broadcasting because the persons who hear the broadcast do not know that the spoken words are being read from a writing. This distinction was discussed in *Meldrum* v. *Australian Broadcasting Co., Ltd.* ([1932] Vict. L. R. 425) where broadcasting from a written script was held by the Supreme Court of Victoria to be a

slander and not a libel. CUSSEN, Acting Chief Justice, rejected *Forrester* v. *Tyrell* (*supra*) upon this distinction. Upon appeal to the full court the judgment was affirmed, one of the judges holding the distinction quite immaterial, another repudiating the cases in Coke's Reports cited in *Forrester* v. *Tyrrell* (*supra*) and the third expressing the view that the publication of a libel must convey to the mind of the person to whom it is published the permanent form in which it is expressed and recorded, citing, by analogy, defamation by statue, effigy or picture which may not be published by oral description. Defamatory words read from a script are published precisely as written. Mere description is in no sense a reproduction of pictorial defamation, which no doubt may be published by copy or photograph; but with that we are not concerned in this case.

Unless in the case of broadcasting we are prepared to do what MANSFIELD, Ch. J., in 1812 declared he could not do in *Thorley* v. *Kerry* (4 Taunt. 355, 364–365) namely, abolish the distinction between oral and written defamation, we must hold to the reason for the distinction so well expressed in a single phrase in *Ostrowe* v. *Lee* (256 N. Y. 36, 39): " What gives the sting to the writing is its permanence of form." This is true whether or not the writing is seen. Visibility of the writing is without significance and we hold that the defendant's defamatory utterance was libel, not slander. We do not reach the question, which has been much discussed, whether broadcasting defamatory matter which has not been reduced to writing should be held to be libellous because of the potentially harmful and widespread effects of such defamation. (See Restatement, Torts, § 568, subds. [1], [3], comments e, f, g.)

The order should be affirmed, with costs, and each certified question answered in the affirmative.

FULD, J. (concurring). Though I concur in the conclusion reached — that defendant's utterance over the radio is actionable per se, without allegation or proof of special damage — I cannot agree with the court's rationale. It impresses me as unreal to have liability turn upon the circumstance that defendant read from a script when, so far as appears from the complaint before us, none of his listeners saw that script or, indeed, was even aware of its existence. As I see it, liability cannot

be determined here without first facing and deciding the basic question whether defamation by radio, either with or without a script, should be held actionable per se because of the likelihood of aggravated injury inherent in such broadcasting.

Traditionally, the distinguishing characteristic of a libel has been its expression in " some *permanent and visible* form, such as writing, printing, pictures, or effigies ", whereas a slanderous statement " is made in spoken words or in some other transitory form, whether visible or audible, such as gestures or inarticulate but significant sounds." (See Salmond on Torts [10th ed.], p. 370; 1 Street, Foundations of Legal Liability, p. 291.) Since " the material part of the cause of action in libel is not the writing, but the publication of the libel " (*Hebditch* v. *MacIlwaine,* [1894] 2 Q. B. 54, 58; *Sheffill* v. *Van Deusen,* 79 Mass. 304), logically consistent application of the classic criteria of libel would seem to require that the publication itself — by which the defamation is made known to third persons — be by writing or other *visible* or *permanent* instrumentality, rather than by mere speech. (See *Osborn* v. *Thomas Boulter & Son,* [1930] 2 K. B. 226, 231, 237; *Meldrum* v. *Australian Broadcasting Co., Ltd.,* [1932] Vict. L. R. 425, 435, 438; Salmond on Torts [10th ed.], pp. 387–388; cf. also, Penal Law, § 1340, defining a libel as " a malicious *publication,* by writing, printing, picture, effigy, sign or *otherwise than by mere speech* * * *." [Emphasis supplied.])

Where, as here, the contents of a defamatory writing reach a third person only in the form of spoken words, of " speech * * * upon the wing " (*Ostrowe* v. *Lee,* 256 N. Y. 36, 39), and with no hint of the existence of a writing, there is a publication of words, not of writing, which, *considered apart from the distinctive features of radio broadcasting,* would, by traditional standards, constitute slander rather than libel.

Our attention is directed to the decision of the English Court of Appeal in *Forrester* v. *Tyrrell* (9 Times L. R. 257 [1893]), and to American cases in accord, that the reading aloud of a libelous document in the hearing and presence of a third person amounts to the publication of a libel. Those decisions, however, rest upon the dubious authority of general propositions enunciated by the English Court of Star Chamber in two early seventeenth-century criminal cases (*De Libellis Famosis,* 5 Co. Rep. 125a

[1605] ; *John Lamb's Case,* 9 Co. Rep. 59b [1610]) long before the advent of the civil action of libel. (See 8 Holdsworth, History of English Law, pp. 364–365.) Extremely broad rules of *criminal* liability were formulated upon those two occasions : thus, in *John Lamb's Case (supra),* it was announced that one who repeated in the hearing of others a libel which he had read or even had merely heard, was himself guilty of publishing a libel. Both cases involved prosecution for libel directed against certain ecclesiastical officials. Doubtlessly designed to aid the then purpose of the Crown to repress libels on Crown and Church officials (cf. 8 Holdsworth, History of English Law, pp. 337–341), and perhaps influenced by the policy of the Star Chamber to punish as a crime even speech of an allegedly seditious character (cf. 5 Holdsworth, History of English Law, p. 211; 8 Holdsworth, History of English Law, pp. 339–340), the broad rules of criminal liability thus declared by the Star Chamber are of highly questionable validity when applied to a civil remedy developed many years later and serving other ends.

It is significant that the most recent expressions on the subject by an English appellate court, albeit by way of dictum, are contrary to the view taken in *Forrester v. Tyrrell (supra).* (See *Osborn* v. *Thomas Boulter & Son, supra,* at pp. 231, 237.) Moreover, even were we to accept the decision in *Forrester* v. *Tyrrell (supra)* — that the reading aloud of a libelous document in the hearing and presence of a third person constitutes the publication of a libel — the same result would not necessarily follow when the hearer is unaware that the words are being read. There might, perhaps, be some basis for urging that where such a third person actually *witnesses* the reading of a written defamation, the extent of the consequent damage to reputation in the hearer's estimation is the same as if he had himself read the document. But certainly, where he does not know, and is not made aware, of the existence of a writing, and the scandalous matter reaches him only in the form of spoken words, the resultant injury is essentially the same as if the defamatory words had been uttered without any writing. (See Lowe, J., in *Meldrum* v. *Australian Broadcasting Co., Ltd., supra,* p. 443; Davis, Law of Radio Communication, pp. 160–162.) The writing in such circumstances can have no " sting ". (See *Ostrowe* v. *Lee, supra,* p. 39.)

If the base of liability for defamation is to be broadened in the case of radio broadcasting, justification should be sought not in the fiction that reading from a paper *ipso facto* constitutes a publication by writing, but in a frank recognition that sound policy requires such a result. (Cf. Stone, The Common Law in the United States, 50 Harv. L. Rev. 4, 9.) Abolition of the line between libel and slander would, I agree, be too extreme a break with the past to be achieved without legislation. (Cf. *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 187.) It is, however, the function of the courts, when called upon to determine which of two competing standards of liability shall be applied in a novel situation, to re-examine and reapply the old rules and to give them new content in the light of underlying vital principles. (See *Oppenheim* v. *Kridel,* 236 N. Y. 156, 164.)

The common-law action on the case for slander, in its sixteenth-century origin, embraced written as well as oral defamation, and the same rules were applicable to both. Certain classes of words — those charging the commission of a crime, those reflecting on one in his trade or profession, for instance — were held actionable per se, damage being presumed from the nature of the words used. All other defamation was actionable only upon allegation and proof of special damage. The newer tort of libel — adapted by the common-law judges in the latter part of the seventeenth century from the criminal law of libel administered in the Star Chamber — eliminated these refinements as regards written defamation, and made the writing itself presumptive proof of damage. (See Veeder, The History and Theory of the Law of Defamation, 3 Col. L. Rev. 546, 558; 8 Holdsworth, History of English Law, pp. 365–367.)

This emphasis on the form of publication was apparently designed to cope with the new conditions created by the development of the printing press. (See *Jones* v. *Jones,* [1916] 2 A. C. 481, 489; see, also, Veeder, The History and Theory of the Law of Defamation, 3 Col. L. Rev., pp. 561–563.) Another development, another invention — here the radio — invites a similar reappraisal of the old rules. (Cf. the decisions involving " talking " motion pictures, *Youssoupoff* v. *Metro-Goldwyn-Mayer Pictures, Ltd.,* 50 Times L. R. 581 [1934]; *Brown* v. *Paramount Publix Corp.,* 240 App. Div. 520.)

Though some have said that the differentiation between libel and slander is the result of historical accident, without rational basis (see Carr, The English Law of Defamation, 18 L. Q. Rev. 255, 388; Veeder, The History and Theory of the Law of Defamation, 3 Col. L. Rev. 571–573), this court, disagreeing, has regarded the " schism " as founded upon policy and " not the product of mere accident ". (See *Ostrowe* v. *Lee, supra,* p. 39, per CARDOZO, Ch. J.) If considerations of principle are to control, there is no valid reason why the same consequences should not attach to publication through the medium of radio broadcasting as flow from publication through the medium of writing.

The primary reason assigned by the courts from time to time to justify the imposition of broader liability for libel than for slander has been the greater capacity for harm that a writing is assumed to have because of the wide range of dissemination consequent upon its permanence in form. (See *Pollard* v. *Lyon,* 91 U. S. 225, 235; *Ratcliffe* v. *Evans,* [1892] 2 Q. B. 524, 530; see, also, Gatley on Libel and Slander, pp. 3–4.) When account is taken of the vast and far-flung audience reached by radio today — often far greater in number than the readers of the largest metropolitan newspaper (cf. Seelman on The Law of Libel and Slander, p. 3) — it is evident that the broadcast of scandalous utterances is in general as potentially harmful to the defamed person's reputation as a publication by writing. That defamation by radio, in the absence of a script or transcription, lacks the measure of durability possessed by written libel, in nowise lessens its capacity for harm. Since the element of damage is, historically, the basis of the common-law action for defamation (see *Jones* v. *Jones, supra,* p. 500), and since it is as reasonable to presume damage from the nature of the medium employed when a slander is broadcast by radio as when published by writing, both logic and policy point the conclusion that defamation by radio should be actionable per se. (See e.g., Restatement, Torts, § 568, subd. [3]; Vold, The Basis for Liability for Defamation by Radio, 19 Minn. L. Rev. 611, 639 *et seq.*; Finlay, Defamation by Radio, 19 Can. B. Rev. 353.)

The order should be affirmed, with costs, and the second question certified should be answered in the affirmative. The first

question is not decisive of the appeal and should not be answered.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND and DYE, JJ., concur with THACHER, J.; FULD, J., concurs in separate opinion.

Order affirmed, etc.