Aaron M. SARGENT, Plaintiff,

v.

NATIONAL BROADCASTING COMPANY, Inc., a corporation, and Wayne L. Hays, Defendants.

Civ. No. 33968.

United States District Court
N. D. California, S. D.
Dec. 20, 1955.

Aaron M. Sargent, San Francisco, Cal., pro se.

Lillick, Geary, Olson, Adams & Charles, San Francisco, Cal., for National Broadcasting Co., Inc.

THOMAS F. MURPHY, District Judge.

Defendant N. B. C. moves to dismiss the amended and supplemental complaint for failure to state a claim upon which relief can be granted. In the alternative it also moves to strike certain paragraphs of the complaint for reasons of immateriality.

The plaintiff's successive pleadings, complaint, amended complaint, amended and supplemental complaint with proposed amendments thereto present a ver-·bosity of allegations that blithely ignore the proscription of Rule 8, 28 U.S.C.A., that a pleading "shall contain * * * a short and plain statement of the claim." Parenthetically, the briefs of both parties, not hampered by any such salutary rule, are equally disturbing both as to size and prolixity.

*First Cause of Action—Defamation.*

Each of the two causes of action will be treated separately. Distilled, the first cause of action for defamation may be summarized as follows:

Invoking diversity jurisdiction plaintiff alleges that he is a citizen of California and an attorney admitted to the bar of that state and the defendant a citizen of Delaware. In substance plaintiff claims that his reputation was injured by a broadcast and telecast of the

defendant originating in New York and heard and seen in New York, California and elsewhere.

According to his interpretation a fair construction of what was said of him on a program entitled "American Forum" on August 8, 1954, by Congressman Hays is that he committed perjury in testifying before a Congressional Committee; that he unlawfully smeared 650 individuals and organizations; that he was unethical and an irresponsible lawyer without any standing in his own state and in his community.

The controversy arises from the following facts as alleged by the plaintiff: He alleges that not only is he an attorney with a sound professional reputation but he has done research into and appeared as an expert before State and Federal investigating committees touching on subversive movements affecting colleges, universities and schools, and as such has acquired a national reputation as an attorney and consultant in such field; that in May 1954 he appeared three times pursuant to subpoena before a Congressional Committee investigating tax exempt foundations and testified; that one of the members of this Congressional Committee was Congressman Wayne L. Hays; that on August 5, 1954, in Washington, D. C., Congressman Reece, chairman of the committee, and Congressman Hays, made a recording and film at the invitation of the defendant for use by it on its radio and television net work program known as the "American Forum." Using the recording and film so made the defendant on August 8, 1954, broadcast the program over its radio and television station in New York, reaching an area insofar as television was concerned of a 50-mile radius, i. e., parts of New York, New Jersey and Connecticut, and insofar as the radio broadcast was concerned, a radius of 375 miles, i. e., parts of New England and the Middle Atlantic States. In addition and as part of such broadcast the defendant caused both programs to be transmitted to its stations throughout the United States including a number of radio and television stations in California, two of which are owned by the defendant in Los Angeles and San Francisco.

The program consisted of a moderator, the aforesaid Congressmen and others, and the questions and answers related to a central topic, "Should Foundations Be Entitled To Tax Exemption." In the course of this program Congressman Reece was explaining that the foundations were given an opportunity to testify and express their views but that it became necessary to discontinue the public hearings, when a panel member interrupted and asked Congressman Hays if he had not tried to disrupt the hearings by constantly interrupting the witnesses. The following then transpired:

"Congressman Hays: *No, Mr. Keyser, that is not a fact:* and, since you brought this out, I will do a little talking about it. Those apparently are the reasons that Mr. Reece says that I am familiar with;
\* \* \*

"Mr. Niles (Panel Member): Didn't you interrupt Mr. Sargent 246 times in the course of a three-hour testimony?

"Congressman Hays: I couldn't say about the three-hour testimony, but I had my staff check him, and I interrupted him a total of 600-and-some times, and I believe that *I didn't interrupt him enough because he alleged by insinuation that 650 responsible American people and institutions tried to prove by guilt by association, and inference and name dropping and quotations that they were sort of leftwingers or something,* and I feel as though that *every time he did that I should have interrupted him,* and I think *I was about 40 interruptions short of what I should have done.*

"Mr. McCormick: Mr. Stevens has a question.

"Mr. Stevens (Panel Member): Wasn't one of these examples a quotation from an encyclical, Mr. Hays?

"Congressman Hays: No, that wasn't in relation to Mr. Sargent's testimony. That was a quotation that I asked Mr. McNiece to comment on and Mr. McNiece commented that he thought that that was closely comparable, I believe I am using his exact language, 'to Communistic literature that I have read.' I didn't do that in order to embarrass Mr. McNiece. *I merely did it to show the danger that could come about from lifting paragraphs out of context, which the witnesses that we had before the committee, notably Mr. Sargent, had done over and over and over again.* (So italicized in the pleading). * * *"

"Congressman Hays: * * * But I didn't call you any names. I may have made an assertion that you did something that you didn't think was just in line with what you thought I should have said, but *I called a spade a spade and I interrupted the witness, and I cross-examined him when I thought it was necessary and when it became too embarrassing for these witnesses— and remember this, Mr. Chairman, you brought in some rather obscure witnesses to testify against some pretty well-known people. And when I thought it was necessary to protect the dignity and the good name of not only the foundations but the Congress from these name droppers, these people lifting paragraphs out of context, these people who were accusing people that they knew nothing about, I felt it my duty to interrupt* and the only time I told you I wouldn't obey the rules was that I said you couldn't gavel me into silence and you couldn't shut the minority up.

"Mr. Keyser: Would you say Dr. Rowe, who is Dean of the Yale University Graduate School, is an irresponsible individual?

"Congressman Hays: Well, we weren't talking about Dr. Rowe, and I might tell you that Dr. Rowe, aft-er the session before the committee—I went down to him and I said, 'I hope, Doctor, that you don't feel that you were subjected to anything unusual,' and he said, 'No,' he said, 'there was nothing out of the way at all. I enjoyed it very much.'

"Now, *the witness we are talking about*—and we might as well face facts—*is this attorney from San Francisco, that the San Francisco Examiner, a Republican paper said, in an editorial, that if the Reece Committee had taken the time and trouble to find out a little about him, which they could have done, and if they had known anywhere near as much as the people of California did, they wouldn't have had him down here in the first place.*

"Mr. Keyser: That is Mr. Sargent, you mean?

"Congressman Hays: That is right. * * *.

"Mr. Keyser: Do you think that Mr. Sargent lied before your committee under oath?

"Congressman Hays: Well, I'll say this, that I asked him—on one page I asked him this question, 'Were you offered the counselship of the Cox Committee'—that is the predecessor committee to this—and on that page he said, and I won't take a lot of time to drag it out, but he answered, 'Yes, sir,' *very positively*, and when I repeated it he said, 'In substance, yes,' and *when I asked him the third time, reminding him he might be in violation of perjury, he said 'No'.*

"Congressman Reece: Since I was a member of the Cox Committee. I was present when the matter of offering him the attorneyship was discussed, and the Chairman was authorized to proffer him the general counselship.

"Congressman Hays: Well, if we could have had open hearings, *I could have brought in a witness— several witnesses who would have*

*testified to the opposite.* I didn't cast any aspersions on you. I just gave you Mr. Sargent's three answers." (So italicized in the pleading.) * * *

It is the plaintiff's contention that the above quoted excerpts spoken of and concerning him falsely accused him of being (1) an unethical lawyer with a bad professional reputation in California, (2) that he was not a gentleman and conducted himself with impropriety, (3) that his conduct was so unfair that it was necessary to interrupt him 600 times, (4) that he was engaged in name dropping and gave quotations out of context and unfairly smeared 650 people and institutions, and (5) that he gave false testimony.

After many other irrelevant and immaterial allegations including purported summaries of New York law alleged to be applicable he then makes the antithetical plea that the action was commenced without a demand for correction and that it was in fact commenced with a demand for correction by sending a copy of the complaint and a formal demand for correction to the defendant, and that the defendant refused to make a correction except on August 29th it stated that the editorial concerning the plaintiff was not in the San Francisco Examiner as had been stated on the program of August 8th but was in the San Francisco Chronicle, and that the plaintiff was not warned of the crime of perjury.

In conclusion he asks specifically for four types of damages, (a) personal damage including the injury to his reputation and mental stress and suffering, (b) injury to his business and profession, (c) legal and other expenses, and (d) other special damage such as prospective loss of fees.

Defendant, relying on the statutory and decisional law of California, moves to dismiss on two general grounds, (1) that the statements are not defamatory on their face and in such situations special damages must be alleged and claims the plaintiff has failed to allege special damage in the manner provided by California law, and (2) under California statutory law in radio and television defamation only special damages are recoverable if the plaintiff does not make a preliminary demand for correction and none was made, or if made was not sufficient, or if sufficient, a correction followed.

Plaintiff replies that since jurisdiction is based upon diversity the New York law of libel is applicable and under such law the broadcast is a libel and not slander, special damages need not be alleged and there is no New York requirement of an antecedent demand for correction. In the alternative he argues that if California law is applicable the statements are defamatory on their face, that he has properly pleaded special damages and that he did in fact serve a proper demand for correction.

At first blush it would appear that the vexing question of choice of law in the troublesome multiple-state defamation field is presented under the Erie-Tompkins doctrine.

Although this court has had occasion in its own district to discuss this problem and formulate a rule based on a grouping of the dominant contacts, cf. Dale System, Inc. v. General Teleradio, Inc., D.C.S.D.N.Y.1952, 105 F.Supp. 745, and other courts and writers have struggled with the problem, Mattox v. News Syndicate Co., 2 Cir., 1949, 176 F. 2d 897, 12 A.L.R.2d 988; Dale System, Inc., v. Time, Inc., D.C.Conn.1953, 116 F. Supp. 527; Note, 28 N.Y.U.L.Rev. 1006 (1953); Leflar, Choice of Law: Torts: Current Trends, 6 Vand.L.Rev. 447 (1953); Leflar, Single Publication Rule, 25 Rocky Mt.L.Rev. 263 (1953); Note, 60 Harv.L.Rev. 941 (1947), resolution of the motion can be made at this preliminary stage without such determination and without binding the trial court when it hears the case on the merits. See Palmisano v. News Syndicate Co., D.C.S.D. N.Y.1935, 130 F.Supp. 17.

A construction of the pleading in question so "as to do substantial justice", Rule 8(f), requires a holding that

a claim for defamation on its face has been made out particularly in view of the allegations accusing plaintiff of unethical conduct and false swearing, matters certainly defamatory of an attorney. This is true both under the California and New York cases. Cal.Civil Code, § 45a; Scott v. Times-Mirror Co., 1919, 181 Cal. 345, 184 P. 672, 12 A.L.R. 1007,; Zator v. Nowy Swiat Pub. Co., 1935, 245 App.Div. 830, 281 N.Y.S. 3; Cassidy v. Warner, 256 App.Div. 878, 9 N.Y.S.2d 295; Bresler v. New York American, Inc., 1930, 227 App.Div. 575, 238 N.Y.S. 296.

■■ If special damages have to be pleaded because the statements are not defamatory on their face special damages have been pleaded both under the California law, California Civil Code, § 45a, Scott v. Times-Mirror Co., supra, and Rule 9(e) of the Federal Rules of Civil Procedure. At least there has been a substantial compliance with both rules. Of course under New York law the broadcast is a libel and special damages need not be pleaded. Hartmann v. Winchell, 1947, 296 N.Y. 296, 73 N.E.2d 30, 171 A.L.R. 759.

■■ Under New York law no prior demand for correction is necessary and if California law is applicable and no proper demand was served such failure does not make the complaint defective but limits recovery only to special damages, California Civil Code, § 48a. But a demand was in fact made which we hold to be a substantial compliance with the California statute and whether there was a correction or not sufficiently broad to meet the challenge or the extent of it is a question of fact for the jury. Scott v. Times-Mirror Co., supra.

Under these different alternatives and without deciding the choice of law question, the questioned pleading, insofar as the first cause of action is alleged, does state a claim and the defendant's motion addressed thereto is denied.

### Alternative Motion to Strike.

Defendant moves in the alternative to strike Article XX; paragraphs 2 and 3 of Article XXII; paragraphs c and d and part of e of Article XXVI and Article XXXII as improper. We assume, although the briefs and motion papers are silent as to the authority for such motion, that it is a motion made under Rule 12(f), i. e., to strike from a pleading matter that is redundant, immaterial, impertinent or scandalous.

■ Article XX and paragraphs 2 and 3 of XXII purport to be a "statement respecting laws of New York and allegations that plaintiff's cause of action arose under the laws of New York and that Section 48–a of the California Civil Code is not applicable." These matters form no part of a pleading and are immaterial. Defendant's motion as to them is granted.

■ Paragraphs c and d and part of e of Article XXVI. These paragraphs and matter refer to allegations of damage whether proper or not (see Section 48a, subd. 4 of the California Civil Code) and objections to them do not come within the province of Rule 12(f). Accordingly, the defendant's motion to strike is denied.

■ Article XXXII relates to alleged criminal acts of Congressman Hays. Since he is no longer a party to this action and the allegations have no possible relation to the second cause of action for alleged violation of the Sherman Act, 15 U.S.C.A. §§ 1–8, 15 note, the defendant's motion to strike is granted.

### Second Cause of Action—Sherman Act Violation.

■ In the second count plaintiff attempts to state a claim for violation of that part of the anti-trust laws which permits a private law suit to those who are injured in their business or property by reason of anything forbidden in the anti-trust laws, 15 U.S.C.A. § 15. This count, too, cannot be described as a plain and concise statement of his claim. It may be summarized as follows:

It is alleged that a monopoly exists in the publishing business creating a shortage in books and materials relating to

the propaganda and activities of the Socialist and Communist parties because of a policy on the part of certain named tax exempt foundations in exercising an arbitrary financial censorship against such research which has prevented the publication of material dealing with the history and development of American, Radical, Socialist and Communist movements and of the Congressional investigations dealing therewith together with their powers and functions. With this as a premise plaintiff alleges that before he appeared and testified before the Congressional committee investigating tax exempt foundations he caused a California corporation to be organized called the Fund for American Leadership, Inc., whose purpose was to conduct research and distribute in interstate commerce books and materials for teaching community leaders in anti-subversive work and that he became its key officer and director; that on August 5, 1955, Congressman Hays formulated the plan to attack the plaintiff over a national radio and television program and proceeded to carry it out in the manner described in the first count.

Hays' purpose, it is alleged, was to create and maintain the monopoly above described so as to cripple the Fund for American Leadership, Inc., and prevent it from engaging in interstate commerce and to restrain interstate commerce.

Plaintiff then alleges that the defendant N. B. C. joined this plan and became a party to it by broadcasting the program referred to in the first count and by refusing to retract. Plaintiff concludes by saying that he has been damaged in his business and profession and as president and counsel to the Fund for American Leadership, Inc.

Plaintiff has characterized this cause of action in his brief as a scheme to destroy competition in the interstate publishing business and to put a potential competitor out of business by means of an attack on the Congressional committee investigating tax exempt foundations, the witnesses appearing before it and the plaintiff. He states, "the tort committed by Hays to destroy the Fund for American Leadership, Inc. involved a direct intellectual assault by libel on the reputation and standing of plaintiff. It follows that the wrong to the plaintiff (his injured reputation) is an integral part of the Sherman Act violation."

Without considering the adequacy of the pleading insofar as it attempts to allege a monopoly in the publishing business and the restraint on interstate commerce, it is quite obvious both from the pleading and from plaintiff's own construction of it that he is not a party in interest. Even assuming that the defendant N. B. C. is properly alleged to be part of this inadequately described monopoly, the plaintiff wholly fails in pleading that he personally has been injured by any violation of the anti-trust laws. He himself states that the tort as to him is the libel complained of and that the competitor that was ruined or injured was the corporation, the Fund for American Leadership, Inc.

■ In order to properly plead a private law suit under the anti-trust laws aside from the other necessary allegations it is elementary that plaintiff must show damage to himself as a direct consequence of the anti-trust law violations. Conference of Studio Unions v. Loew's Inc., 9 Cir., 1951, 193 F.2d 51, certiorari denied, 1952, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687; Loeb v. Eastman Kodak Co., 3 Cir., 1910, 183 F. 704; Gerli v. Silk Ass'n of America, D.C.S.D.N.Y. 1929, 36 F.2d 959; Corey v. Boston Ice Co., D.C.Mass.1913, 207 F. 465; Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C.S.D.N.Y.1939, 30 F.Supp. 389, affirmed mem., 2 Cir., 1940, 113 F.2d 114.

Accordingly defendant's motion to dismiss the second cause of action is granted.

Settle order.