94 N.Y.2d 73 (1999)
721 N.E.2d 957
699 N.Y.S.2d 707
ELIZABETH CAPROTTI, Individually and as Parent of JOHN CAPROTTI, et al., Infants, Appellants,
v.
TOWN OF WOODSTOCK et al., Respondents, et al., Defendant.
Court of Appeals of the State of New York.
Argued September 15, 1999.
Decided November 18, 1999.
*74 Richard A. Altman, New York City, and Enid W. Langbert for appellants.
Kerr & Weiss, New Paltz (Marsha Solomon Weiss of counsel), for respondents.
Chief Judge KAYE and Judges BELLACOSA, SMITH and WESLEY concur with Judge ROSENBLATT; Judge LEVINE dissents and votes to reverse in a separate opinion; Judge CIPARICK taking no part.

*75 OPINION OF THE COURT
ROSENBLATT, J.
In this common-law defamation action, plaintiffs seek compensatory and punitive damages against a municipality, alleging that they were defamed by an independent programmer on the municipality's public access television channel. The issue before us is whether 47 USC § 555a (a) immunizes the municipality from liability for monetary damages. Under that section, immunity extends to any claim against a municipality "arising from the regulation of cable service." We conclude that plaintiffs' claim arises from the regulation of cable service, and therefore uphold dismissal of the complaint against the municipality.

Facts and Procedural History
Defendant Town of Woodstock (the municipality) granted non-party Kingston Cablevision, Inc., a franchise for the construction and operation of a cable television system. In the franchise agreement, Kingston Cablevision agreed to provide public access capability to the municipality.[1] The agreement further provided that "[r]ules and regulations for use of the public access capability shall be promulgated by [the municipality]."
In accordance with that provision, the municipality promulgated regulations (the Regulations) and delegated management of the channel to defendant Woodstock Public Access Committee (the WPAC), a body consisting of five people chosen by the municipality's Town Board. Among the Regulations is a provision prohibiting the presentation of material that constitutes libel, slander or invasion of privacy. The municipality's Regulations further provide that "[w]hen program violations are brought to the attention of the WPAC, it may take such steps that are necessary to comply with WPAC regulations, and applicable local, state and federal laws and regulations."
Shortly after the public access channel began broadcasting, Ronald Rybacki produced and appeared in his own weekly television program on its airwaves. Plaintiff Elizabeth Caprotti, *76 who had briefly dated Rybacki, alleges that he used his program to wage a vicious campaign of harassment against her by repeatedly defaming her and her three sonsalso plaintiffs in this actionon television. Plaintiffs assert that despite their complaints to members of the municipality's Town Board and WPAC, the municipality refused to stop Rybacki's defamatory broadcasts, and thereby willfully failed to comply with the Regulations. The nature of these allegations is not in dispute. Indeed, Rybacki reportedly was prosecuted criminally for harassing the plaintiffs, and an order of protection was issued against him prohibiting him from discussing plaintiffs on the air.
Plaintiffs sued the municipality, members of its Town Board, the WPAC, members of the WPAC, the channel's station manager (collectively, the municipal defendants) and Rybacki, seeking compensatory and punitive damages for common-law defamation. Rybacki defaulted, and a judgment was entered against him. Supreme Court held that 47 USC § 555a (a) clothed the municipal defendants with immunity from liability for monetary damages, and the Appellate Division unanimously affirmed. We agree with the reasoning of the courts below, and, therefore, affirm.

Statutory Analysis
The Cable Communications Policy Act of 1984 (the 1984 Act) was the first comprehensive Federal statute regulating the cable television industry. A stated, primary purpose of the legislation was to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public" (47 USC § 521 [4]). In keeping with that aim, Congress sought to insure that cable companies devote portions of their systems to programming over which the companies had no editorial control, thereby providing the public with additional avenues of information (see, Note, Denver Area Telecommunications Consortium, Inc. v. FCC And The Public Forum Status Of Cable Access Channels, 63 Brook L Rev 955, 961-962 [Fall 1997]).[2]
The 1984 Act furthered the objective by empowering a local municipality, as franchisor, to require that a cable operating *77 company establish "public access channels" (i.e., channels that are operated by the local municipality and are not controlled by the cable operator).[3] Congress envisioned that public access channels would become "the video equivalent of the speaker's soapbox or the electronic parallel to the printed leaflet" (HR Rep No. 98-934, 98th Cong, 2d Sess, at 59, reprinted in 1984 US Code Cong & Admin News 4655, 4696).
By placing municipalities in the regulatory arena, however, the 1984 Act exposed them to numerous lawsuits brought by cable companies asserting that their First Amendment rights were violated when they were not awarded municipal cable contracts (see, S Rep No. 102-92, 102d Cong, 2d Sess, at 48-49, reprinted in 1992 US Code Cong & Admin News 1133, 1181). Thus, when Congress restructured the 1984 Act and passed the Cable Television Consumer Protection and Competition Act[4] in 1992, it included section 555a (a), which provides that
"[i]n any court proceeding * * * involving any claim against a franchising authority or other governmental entity * * * arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief" (47 USC § 555a [a] [emphasis added]).
The issue before us is whether plaintiffs' tort claim, which is predicated on the municipal defendants' decision to allow Rybacki *78 to continue broadcasting defamatory speech, "aris[es] from the regulation of cable service" and is therefore defeated by the immunity provision.
By its plain and unconditional terms, section 555a (a) grants a local municipality broad immunity from monetary liability that arises out of "any" of the municipality's regulatory decisions involving cable television. We hold that the municipal defendants made a regulatory decision when they allowed Rybacki to continue on the air in the face of persistent complaints. Although we are mindful of the undisputed defamatory nature of Rybacki's broadcasts, our role is not to decide whether the municipality's decision was a good one; our focus is limited to whether the municipality "regulat[ed]" cable service, and we conclude that it did.
By statutory grant, the municipality is vested with authority to address allegedly defamatory programming (see, 47 USC § 531 [b]). Based on that authority, the municipality promulgated what it aptly called "Regulations." By deciding to permit Rybacki to continue his broadcasts on their public access channel, the municipal defendants were engaged in "regulation" of cable service to no less a degree than had they stopped him.
Nothing in section 555a (a)'s legislative history diminishes the breadth of the immunity conferred by the statute's plain terms. We agree that, as plaintiffs point out, the immunity provision was motivated by the need to protect local franchising authorities "from being pressured into making unmeritorious franchising decisions by the threat of expensive damages litigation by cable companies" (see, 138 Cong Rec H6487, H6530 [July 23, 1992]). Indeed, the original provision passed by the Senate immunized local franchising authorities from monetary liability solely "in cases where the franchising authorities are charged with violating a cable operator's First Amendment rights arising from actions authorized or required by [the 1984] act" (HR Conf Rep No. 102-862, 102d Cong, 2d Sess, at 98, reprinted in 1992 US Code Cong & Admin News 1231, 1280). The scope of the statute's immunity was, however, significantly broadened during the course of the legislative process.
In the end, Congress expanded the Senate's original proposed immunity provision by adopting the significantly broader House amendment. The final version thus extends municipal immunity to "any claim * * * arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer or amendment of a *79 franchise" (see, HR Conf Rep No. 102-862, op. cit., at 99 [emphasis added]). If Congress was concerned exclusively with immunity from suits by aggrieved cable operators, it would not have deliberately enacted the additional sphere of immunity from any claims "arising out of the regulation of cable service."
The dissent would allow plaintiffs to maintain a defamation action for money damages, concluding that the right to such relief is not preempted by the 1984 and 1992 Acts. We disagree and rest our determination on the plain language of section 555a (a), which except for declaratory and injunctive relief, expressly precludes "any claim against a franchising authority or other governmental entity * * * arising from the regulation of cable service." Unlike the Federal statutes at issue in cases cited by the dissent, section 555a (a) leaves no room for guesswork or interpretation. Preemption is not implied; it is express. The statute unambiguously preempts "any relief, to the extent that such relief is required by any provision of * * * State, or local law."
At least one other municipality has successfully invoked section 555a (a) under facts analogous to these. The Eighth Circuit Court of Appeals, in Coplin v Fairfield Pub. Access Tel. Comm. (111 F3d 1395, 1408 [1997]), held that section 555a (a) immunized a municipality from monetary liability in a lawsuit arising out of the municipality's regulatory decision concerning programming content on its public access channel. In Coplin, however, the municipality decided to ban, rather than continue, a program that aired allegedly defamatory statements (see, Coplin v Fairfield Pub. Access Tel. Comm., supra, at 1400). Like the municipal defendants here, the municipality in Coplin was sued because of the manner in which it regulated its public access channel's programming (see, Coplin v Fairfield Pub. Access Tel. Comm., supra, at 1400). For purposes of our analysis, we see no meaningful distinction between Coplin and the case at bar. If cable television may be likened to a faucet of public information, one regulates the faucet no less by deciding to let it run than by turning it off.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
LEVINE, J. (dissenting).
I respectfully dissent. Defendants are the Town of Woodstock, its Town Board and Public Access Committee, and the manager of the Town's public access cable television station. They do not contest the allegations of the complaint that for four years (between 1991 and 1995) Ronald *80 Rybacki produced and hosted a weekly two-hour television program on the Woodstock public access cable channel in which he regularly and repeatedly defamed and vilified in obscene terms plaintiffs Elizabeth Caprotti and her three sons. Just within the period of 90 days prior to the filing of plaintiffs' notice of claim, Rybacki made nine defamatory statements, characterizing Caprotti as a drug addict and a bisexual, who even indulged her addiction and sexual practices in the beauty shop she operates.
Defendants do not dispute that Caprotti repeatedly complained to them about Rybacki's attacks and remonstrated with them to take him off the air. Nor is it disputed that defendant had the legal power, under the Cable Communications Policy Act of 1984, as amended by the Cable Television Consumer Protection and Competition Act of 1992 (47 USC §§ 521-573) (hereinafter collectively referred to as the Cable Acts) and the Public Access Committee's own regulations promulgated thereunder, to withhold Rybacki's use of the public access channel for his constitutionally unprotected expressions (see, 47 USC § 531 [b], [c]; Denver Area Educ. Telecommunications Consortium v Federal Communications Commn., 518 US 727, 761-762; McClellan v Cablevision of Conn., 149 F3d 161, 168 [2d Cir]). Nevertheless, defendants concede that they declined to take Rybacki off the public access channel or otherwise control his defamatory communications and, thus, Caprotti was compelled to endure the personal anguish, public humiliation and economic loss of beauty shop clientele from his televised attacks over that lengthy period.
Defendants do not contest that, by knowingly enabling Rybacki to spread his defamatory lies over the Town's public access cable channel, they facilitated Rybacki's publication of the libels and, therefore, are joint tortfeasors under New York common-law principles of defamation (see, Youmans v Smith, 153 NY 214, 218-219; Anderson v New York Tel. Co., 35 NY2d 746, 750 [Gabrielli, J., concurring]; see also, Hartmann v Winchell, 296 NY 296, 304 [Fuld, J., concurring]).
The majority, however, has accepted the sole defense advanced here to defeat plaintiffs' State tort damage causes of action, that 47 USC § 555a (a), added to the Cable Acts' statutory scheme by the 1992 Cable Television Consumer Protection and Competition Act, immunizes defendants from liability for monetary damages. Thus, the majority holds that section 555a (a) of the Cable Acts expressly preempts plaintiffs' damages claims. In doing so, the majority ignores principles of statutory *81 interpretation the Supreme Court has imposed in applying the Supremacy Clause (US Const, art VI, cl [2]) in express preemption cases.[*] The majority impliedly concedes that its expansive reading of section 555a (a) finds no support in the legislative history, merely finding that the legislative history fails to "diminish[] the breadth of the immunity conferred by the statute's plain terms" (majority opn, at 78 [emphasis supplied]). It leaves no doubt regarding its exclusive reliance on the plain meaning doctrine in finding express preemption. "We * * * rest our determination on the plain language of section 555a (a)" (majority opn, at 79). The majority supports its ruling with a Federal Circuit Court decision (Coplin v Fairfield Pub. Access Tel. Comm., 111 F3d 1395 [8th Cir]) which is demonstratively distinguishable in two key respects and, if anything, supports the opposite conclusion. Application of the plain meaning doctrine to find that Federal law has expressly preempted plaintiffs' State tort damage causes of action is, in my view, contrary to United States Supreme Court canons of construction in this sensitive area of constitutional federalism. Indeed, in its most recent major preemption case, Medtronic, Inc. v Lohr (518 US 470), the Court expressly rejected exclusive reliance on a plain meaning approach. "Although our analysis of the scope of the pre-emption statute must begin with its text * * * our interpretation of that language does not occur in a contextual vacuum. Rather, that interpretation is informed by two presumptions about the nature of pre-emption" (id., at 484-485 [emphasis supplied, internal citations omitted]).
Both of the presumptions outlined in Medtronic are directly applicable here. First, as already discussed, we deal here with a claim of express preemption of a New York common-law remedy for tortious conduct. The Supreme Court has recognized that a State common-law tort remedy may well be considered to fall within the historic police powers of the State (see, Cipollone v Liggett Group, 505 US 504, 518; Taylor v General Motors Corp., 875 F2d 816, 823 [11th Cir], cert denied 494 US 1065). Especially when this is the case, Medtronic teaches that
"[i]n all pre-emption cases, and particularly in those in which Congress has `legislated * * * in a *82 field which, the States had traditionally occupied' * * * we `start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress'" (Medtronic, Inc. v Lohr, supra, at 485 [emphasis supplied, internal citations omitted]).
This presumption not only applies to militate against a congressional intent to preempt at all, but also to limit and narrow the scope of any intended supersession of State law (see, id., at 485; Cipollone v Liggett Group, supra, at 518, 523).
The second proposition articulated in Medtronic is that "`the purpose of Congress is the ultimate touchstone' in every pre-emption case" (Medtronic, Inc. v Lohr, supra, at 494, quoting Retail Clerks Intl. Assn. v Schermerhorn, 375 US 96, 103). To discern the existence and the scope of any congressional intention to preempt State law, a court must look not only at the statutory language, but the legislative framework, the structure and purpose of the statute as a whole and a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers and the law" (Medtronic, Inc. v Lohr, supra, at 486).
Based upon the analysis required by the United States Supreme Court in a case such as this, defendants have failed to demonstrate that plaintiffs' common-law damages remedy for defamation by these joint tortfeasors was expressly preempted by 47 USC § 555a (a). The text is manifestly far from plain, and its ambiguity works heavily against preemption (see, Cipollone v Liggett Group, supra, 505 US, at 533 [Blackmun, J., concurring in part with Kennedy and Souter, JJ.]; id., at 548 [Scalia, J., concurring in part with Thomas, J.]):
"In any court proceeding * * * involving any claim against a franchising authority or other governmental entity * * * arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State or local law, shall be limited to injunctive relief and declaratory relief" (47 USC § 555a [a] [emphasis supplied]).
Taken literally, plaintiffs' damage claims do not "arise[] from *83 the regulation of cable service." Rather, their injuries arose from the absence of defendants' regulation of Rybacki's defamatory expressions. The majority overcomes this semantic hurdle by broadly interpreting the statutory phrase "regulation of cable service" to include "`any' of the municipality's regulatory decisions involving cable television" (majority opn, at 78), whereby, then, a decision not to regulate becomes "regulation." To bolster its conclusion that regulation includes nonregulation, the majority interposes the "any" in the statute as a modifier of "regulation." While the majority's expansive interpretation is not conclusively foreclosed by the text, it certainly is not compelled. Indeed, the United States Supreme Court, in another express preemption context, specifically rejected the contention "that the absence of regulation itself constitutes regulation" (Freightliner Corp. v Myrick, 514 US 280, 286).
Also of significance, while the text of section 555a (a) refers to "relief * * * required by any other provision of Federal, State or local law," there is no specific exclusion of common-law remedies. "Courts finding no express preemption agree that the absence of any explicit reference to common-law actions in the preemption clause leads to a no-express preemption conclusion" (Drattel v Toyota Motor Corp., supra, 92 NY2d, at 46).
Furthermore, neither the context nor the legislative history of section 555a (a) supports extending its statutory immunity to damage claims by private individuals who are not themselves subject to regulation by a franchising authority. Thus, the immediately preceding section, 47 USC § 555, gives cable operators access to the courts to seek relief from various adverse determinations by franchising authorities. The statutory scheme of the 1984 Cable Act left the primary means of regulating cable operations, facilities and services in the hands of local franchising authorities (see, Time Warner Entertainment Co. v Federal Communications Commn., 93 F3d 957, 963 [DC Cir]). Local franchising authorities were given the power to establish and enforce requirements for facilities and equipment for the operation of a cable system (47 USC § 544 [b] [1]) and to regulate cable television service rates for subscribers in the absence of competition among operators (47 USC § 543 [a]).
Thus, the Cable Acts contemplate or provide for a variety of regulatory activities by franchising authorities beyond the determination to grant or deny a franchise to a prospective cable operator. Franchising authorities are also given some power to regulate the content of all cable programing through the *84 franchise agreement and their regulations respecting "cable services [that] are obscene or otherwise unprotected by the Constitution" (47 USC § 544 [d] [1]). Therefore, to that degree, franchising authorities can also exert regulatory control over cable television performers, programmers and producers. It is all of these cable industry participants who section 555a (a) was intended to bar from suing for damages "arising from [their] regulation" by franchising authorities, not private parties who are not subject to any regulation under the Cable Acts.
Further fortifying the conclusion that 47 USC § 555a (a) was not intended to preempt State defamation claims is the provision in a companion section which specifically and expressly directs that "cable operators shall not incur any such liability [for defamation] for any program carried on any [public access] channel * * * unless the program involves obscene material" (47 USC § 558 [emphasis supplied]). Congress singled out cable operators, but not franchising authorities, for immunity from liability for defamations over public access channels because "the bill otherwise prohibits the operator's editorial control over all such channels" (H Rep No. 98-934, 98th Cong, 2d Sess, at 95, reprinted in 1984 US Code Cong & Admin News 4655, 4732 [emphasis supplied]; 130 Cong Rec S14285, reprinted in 1984 US Code Cong & Admin News, at 4738 ["The Senate * * * adopts the explanation * * * contained in House Report 98-934"]; see, 47 USC § 531 [e]). As already shown and not disputed, however, franchising authorities are given the power to assert "editorial control" to prevent defamatory communications over public access channels. Congress therefore had every reason to leave franchising authorities accountable in damages for failing to exercise control over defamations on public access channels. It is quite apparent that the omission of franchising authorities from immunity for defamation liability in section 558 was intentional. The inclusion of cable operators but omission of franchising authorities in the only section of the Cable Acts dealing specifically with immunity from defamation liability adds a powerful expressio unius est exclusio alterius argument against the majority's application of section 555a (a) to give franchising authorities immunity from State defamation liability (see, McKinney's Cons Laws of NY, Book 1, Statutes § 240).
The legislative history reveals that the congressional intent behind 47 USC § 555a (a) as originally proposed and finally enacted was identical. In the original Senate version, it was *85 intended to prevent coercive damage suits under 42 USC § 1983 and State civil rights laws, arising out of "any action expressly authorized [by law] * * * including a franchising authority's decision to grant or deny a franchise, renew or not renew a franchise, to approve or deny the transfer of a franchise, amend or not amend a franchise, or otherwise regulate a cable operator" (S Rep No. 102-92, 102d Cong, 2d Sess, at 49-50, reprinted in 1992 US Code Cong & Admin News 1133, 1182-1183 [emphasis supplied]).
While the subsequently enacted House of Representatives version of section 555a (a) contains more generalized language than the Senate bill, the purpose, as articulated by its sponsor, then Representative Charles Schumer of New York, was the same: "to protect local authorities from being pressured into making unmeritorious franchising decisions by the threat of expensive damages litigation by cable companies" (138 Cong Rec H6487, H6530 [July 23, 1992]). Thus, the more generalized language of the House bill can best be read as intended to insure that the singular purpose of both Houses of Congress be effectedto prevent "strike" damage suits against local franchising authorities by disgruntled persons or corporate entities in the cable television industry who are subject to franchising decisions "or otherwise regulate[d]" by those municipal authorities.
Limiting the scope of statutory immunity from money damage liability to claims asserted by cable operators, producers and programmers of the cable industry who are subject to regulation by franchising authorities is consistent with the interpretation of section 555a (a) by every Federal court that has addressed that provision.
"So far as we can tell, Congress gave local franchising authorities protection in order to insulate their decisionmaking from the threats of suits for damages brought by disappointed cable operators" (Time Warner Entertainment Co. v Federal Communications Commn., supra, 93 F3d, at 980 [emphasis supplied]).
"We conclude that section 555a (a) promotes Congress's substantial interest in having municipalities regulate cable operators without fear of potentially overwhelming damage awards" (Jones Intercable v City of Chula Vista, 80 F3d 320, 326 [9th Cir; emphasis supplied]).

*86 "Congress found that claims against municipalities for civil damage liability related to their regulatory activities of the cable industry were posing `a potentially crippling burden' * * *. Elimination of that exposure is thus designed to preserve the municipal franchising and regulations scheme envisioned by the 1984 Act" (Daniels Cablevision v United States, 835 F Supp 1, 11-12 [D DC; emphasis supplied]).
Coplin v Fairfield Pub. Access Tel. Comm. (supra, 111 F3d 1395), relied upon by the majority, is not to the contrary. First, the plaintiff in Coplin brought a damage action under a Federal statute, 42 USC § 1983, allegedly for violating his constitutional rights to free speech when the talk show he produced and hosted was suspended by the local public access television committee for its libelous content. In contrast to the instant case, the plaintiff in Coplin did not assert any State common-law cause of action for damages. Thus, the court in Coplin could, if it wished, apply the plain meaning doctrine to 47 USC § 555a (a), free from the federalism-based constitutional constraints imposed by the Supreme Court where, as here, State common-law remedies are claimed to be superseded. Second, Coplin was a producer and programmer on the public access channel, and as such he was subject to content regulation by the franchising authority. Thus, dismissal of his section 1983 damages action was completely consistent with a reading of section 555a (a) limiting its application to bar damage suits by persons or entities subject to regulation by a franchising authority, and adversely affected by such regulation.
Since, in my view, defendants have completely failed to demonstrate any "clear and manifest purpose of Congress" to preempt plaintiffs' State common-law defamation damages action, I vote to reverse and reinstate the complaint.
Order affirmed, without costs.
NOTES
[1] In 1984, Congress enacted the Cable Communications Policy Act (Pub L No. 98-549, 98 US Stat 2779 et seq. [codified as amended in scattered sections of 47 USC]), which expressly permits a "franchising authority" (i.e., a local municipality empowered to grant a cable television franchise) to include in its franchise proposal to a cable operating company a statement that the municipality reserves channels for public, educational or government use (47 USC § 531).
[2] A "cable operator," is the entity that "provides cable service over a cable system and * * * owns a significant interest in such cable system" (47 USC § 522 [5]). In the case before us, non-party Kingston Cablevision, Inc., is a "cable operator."

In the pleadings and in their brief, plaintiffs refer to the municipality as the cable operator. If we were to consider the municipality as the operator, it would not avail plaintiffs, considering that the municipality as "operator" would be covered by the immunity provision of section 558, which provides that "cable operators shall not incur * * * liability for any program carried on any [access channel] * * * unless the program involves obscene material" (47 USC § 558). We base our decision, however, on the immunity provision of section 555a (a).
[3] See, 47 USC § 531 (b). The 1984 Act authorizes municipalities to require cable operators to provide two types of "access channels": (1) leased access channels (47 USC § 532), and (2) public access channels (47 USC § 531). Leased access channels are channels that cable operators lease commercially to unaffiliated third parties. On the other hand, public access channels are managed independently by local municipalities. A local municipality is granted a public access channel as a quid-pro-quo for the cable operator being allowed to use the public rights-of-way to construct its cable system (see, Note, 63 Brook L Rev, op. cit., at 960).
[4] Pub L No. 102-385, 106 US Stat 1460 (codified as amended in scattered sections of 47 USC).
[*] Defendants have not contended and could not contend here that implied preemption applies, either by way of congressional occupation of the field or because State tort law conflicts with Federal law (see, Drattel v Toyota Motor Corp., 92 NY2d 35, 42). Thus, the sole issue is express preemption under the Supremacy Clause.