HARRY LANDAU, Doing Business under the Name of CREDIT CONSULTANTS, Plaintiff, *v.* COLUMBIA BROADCASTING SYSTEM, INC., et al., Defendants.

Supreme Court, Trial Term, New York County, February 20, 1954.

*Sigmund Goldstein* for plaintiff.

*Walter R. Barry, Carleton G. Eldridge, Jr.,* and *Gerald J. Dunworth* for defendants.

FRANK, J. This is a libel action. At 10:30 P.M. on February 28, 1952, the television audience of New York City and its environs, and simultaneously, other viewers in sixteen cities across the country from Boston and Baltimore to Hollywood and San Francisco, could, if so inclined, see and hear a half-hour presentation of one of a weekly series of programs known as " Crime Photographer ". At later times, by kinescope, the same play was presented from twenty-five additional stations. The number of people who saw this program, televised as it was on a major network, cannot be accurately estimated. Since ownership of television sets in this country is epidemic, the fair inference is that it was viewed by millions.

The title of the program specifically involved was " The Easy Way ". Its plot, synopsized from the filmed presentation in court, embraced the efforts of Casey, a stalwart young newspaper photographer employed by " The Daily Express ", to annihilate a book-making ring headed by one Sam Henderson. Casey must perforce deliver the outlaws to justice, not only without benefit of police assistance and within the limits of a given half hour, but even in the face of Henderson's scheme for his murder. Needless to say, at the scheduled climax, the redoubtable Casey thwarted the evil machinations of Henderson and his henchmen, who were themselves shot and killed.

The presentation took twenty-nine minutes, twenty-one seconds, including commercials. One of the sets depicted the receptionist's room of Henderson's offices. On the glass panel of a door leading to Henderson's private room was the legend "Credit Consultant, Inc."

In the entire half-hour showing, the legend appeared on two occasions for a total of ten and three-fourths seconds. It is upon these two flashes of this title that the claim for very substantial damages is based.

The plaintiff, Harry Landau, is a bill collector who maintains a one-room office in this city. He employs a full-time secretary, and occasionally a part-time assistant. On August 17, 1948, he filed a certificate of doing business under the name "Credit Consultants" in the office of the County Clerk of New York County. For some time prior to that date, a certificate signed by his former wife for the same assumed name had been on file. The name "Credit Consultants" is listed in the Manhattan telephone directory and in a trade publication.

The program would have slipped into the limbo of all such chefs-d'oeuvre of crime detection, had not Arthur A. Cohen, plaintiff's certified public accountant, telephoned him to report that he had seen a television show in which Landau's trade name had been used.

Plaintiff contends that the use of the legend "Credit Consultant, Inc." in the play and its similarity to his trade name "Credit Consultants" identified him with the fictional character Sam Henderson delineated as a villain, a criminal and a gangster. It is charged that such a portrayal was a libel and that the plaintiff was thereby held up as an object of "scorn, shame, contempt and obloquy among his neighbors, friends, business clientele, acquaintances, and his credit standing, and his reputation has been most seriously damaged and impaired."

Our State courts have not heretofore been called upon to determine whether the publication of defamatory matter through the medium of television constitutes libel. It has, however, been held that libel was the proper cause of action where the instrumentality was a motion picture (*Brown* v. *Paramount Publix Corp.*, 240 App. Div. 520). So, too, was it decided that a defamatory radio broadcast from a script was libel (*Hartmann* v. *Winchell*, 296 N. Y. 296). The United States District Court (So. Dist., N. Y.) sustained a complaint alleging libel by means of television (*Remington* v. *Bentley*, 88 F. Supp. 166). Here the performance was based upon a script. It is held that if

---

defamation of the plaintiff resulted from this television presentation, an action in libel would be the proper remedy.

To paraphrase decisional language, the test to be applied is whether the legend employed and the pictorial images exposed import *naturally* to the mind of a man of ordinary intelligence, a criminal or disgraceful charge (*More* v. *Bennett*, 48 N. Y. 472; *Mencher* v. *Chesley*, 297 N. Y. 94; *Hoey* v. *New York Times Co.*, 138 App. Div. 149, 158; *Larsen* v. *Brooklyn Daily Eagle*, 165 App. Div. 4, affd. no opinion 214 N. Y. 713; *Kloor* v. *New York Herald Co.*, 200 App. Div. 90; *Gilmartin* v. *Day*, 214 App. Div. 230).

Not all discomfort, embarrassment, notoriety or even ridicule that may follow a badly conceived or careless publication is enough to establish libel. It is actionable only when the words used encompass appreciable injury to reputation or business (*Kimmerle* v. *New York Evening Journal*, 262 N. Y. 99; *Lamberti* v. *Sun Print. & Pub. Assn.*, 111 App. Div. 437).

The script from which the performance was dramatized was wholly fictional. The plot, settings, characters and dialogue were entirely the product of imagination. It was, therefore, completely within the framework of "The species of literature which is concerned with the narration of imaginary events and the portraiture of imaginary characters" defined as fiction (New English Dictionary, Oxford, 1901, vol. 4, p. 187). Therein it differed markedly from the fictionalized version of an actual incident which was the basis of the libel in *Brown* v. *Paramount Publix Corp.* (240 App. Div. 520, *supra*).

Certainly no normal adult could mistake the play under discussion for anything but an imaginary event involving fictional characters. Moreover, there was no attempt by the defendants, directly or inferentially, to create any other impression.

For the plaintiff to succeed requires a finding that the monetary use of the legend similar to his trade name was defamatory. To make such accidental or coincidental use of a name a libel would impose a prohibitive burden upon authors, publishers and those who distribute the fruits of creative fancy, in whatever form presented (*Clare* v. *Farrell*, 70 F. Supp. 276).

To avoid the charge of libel would compel the need to scan thousands of telephone directories and business indices, to comb voting lists and city rosters, to rake the census rolls and myriad listings of names, individual, trade and corporate. With our population stemming from every national origin, bearing names of infinite variety, even to anagrammatize a name like

Jones or to spell it backwards would be little protection, for somewhere in this wondrous land there must be someone named Senoj.

By this the thought is not intended that merely to cloak a defamatory publication in the guise of fiction would extend immunity to one responsible therefor. Our courts give no sanction to such a subterfuge (*Corrigan* v. *Bobbs-Merrill Co.,* 228 N. Y. 58). The line of demarcation is not obscure. The difference between coincidental use and consciously disguised defamation is one of proof.

In addition to plaintiff's accountant, the only other witness called who saw the performance was James A. Morano, assistant manager of the bank where plaintiff maintained an account. These witnesses were amused by the coincidence. The accountant inspired the thought that an action might lie. The banker inquired whether the plaintiff had been compensated for the use of his trade name. Neither of them was misled into the belief that the portrayal was intended to be " of or concerning the plaintiff ".

Assuming, *arguendo,* that libel can be found in the use of the legend by the defendants, proof would be required that the alleged defamatory matter was " of and concerning the plaintiff " (Seelman on Law of Libel and Slander, par. 98, p. 98; *Corrigan* v. *Bobbs-Merrill Co.,* 228 N. Y. 58, 64, *supra; Weston* v. *Commercial Advertiser Assn.,* 184 N. Y. 479). That question and its corollary, i.e., the identification of plaintiff with the alleged defamatory matter, is for the triers of the facts (*Cross* v. *Cantor,* 270 N. Y. 93, 96). So too is it a question of fact where, as here, the plaintiff is not named (*Stokes* v. *Morning Journal Assn.,* 66 App. Div. 569; *Garrison* v. *Sun Print. & Pub. Assn.,* 164 App. Div. 737, appeal dismissed 222 N. Y. 691).

The plaintiff, Harry Landau, contends that the use of the title, " Credit Consultant, Inc. ", identified him as Sam Henderson, the criminal chief of the unlawful gambling syndicate.

The court cannot so find from the proof. On the contrary, the visual exhibition in the courtroom of the film made at the time the play was televised discloses, and it is found: (1) there is no resemblance between plaintiff and the character, Sam Henderson; (2) there is no similarity between the office settings in the play and plaintiff's office; (3) there is no suggestion of similarity between the business conducted in the offices in the play and that of Landau; (4) there is no similarity in the names Sam Henderson and Harry Landau. It is significant,

too, that the mythical character, whose portrayal plaintiff contends defamed him, was killed at the play's end. This situation clearly distinguishes the plaintiff from identity with his claimed counterpart.

In fine, it is determined that the plaintiff has failed to establish that the fictitious Sam Henderson was or was likely to be identified as or with him and has therefore failed to establish that the alleged defamation is of or concerning him (*Slobodin v. Sun Print. & Pub. Assn.*, 120 N. Y. S. 386).

. While not essential to the decision herein, and quite apart from the presumptions of law, rebuttable or not, the record establishes and it is found: (1) that none of the defendants knew the plaintiff or were aware of the existence of his business, its nature or trade name; (2) there was no intention to libel plaintiff; (3) there was no express malice; (4) plaintiff was not scorned, shamed, held in contempt or obloquy by his neighbors, friends or business clientele.

This constitutes the decision of the court. The clerk is directed to enter judgment for the defendants.