**Richard R. RISS, Sr., Appellant,**

v.

**Ardith L. ANDERSON, Appellee.**

No. 16719.

United States Court of Appeals
Eighth Circuit.

June 7, 1962.

Carl E. Laurent, of White & Laurent, Kansas City, Mo., Richard L. White, Kansas City, Mo., on the brief, for appellant.

David Skeer, Kansas City, Mo., for appellee.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This diversity action is one for damages for defamation by television on September 15, 1959. It was tried to the court and resulted in a judgment for the plaintiff against the individual defendant for $2,000 actual damages and $8,000 punitive damages. That defendant has appealed.

The plaintiff Anderson is an over-the-road truck driver residing in Kansas City, Kansas. The defendant Riss is a Missouri citizen engaged in the trucking transportation business. His corpora-

tions, Riss & Company, Inc., and Transport Manufacturing and Equipment Company of Delaware, are, respectively, a common carrier by truck and an owner of buildings and equipment which are leased to the carrier and to its employee-truckers.[1]

Anderson had been a driver for Riss since March 1955. In early 1959 he was was working as an owner-operator under agreements by which Transport leased to him a motor vehicle tractor and he, in turn, leased it to Riss & Company. A dispute arose at that time as to Anderson's obligation to provide new tires for the vehicle and as to his right to use for that purpose a reserve fund built up by deductions from Riss & Company's payments under its lease. This controversy was negotiated by Anderson's lawyer and Riss & Company and was settled in February 1959. As part of that settlement, the two lease agreements were terminated. Anderson did not thereafter work for Riss or for either of the corporations. This all took place prior to the accused television program of the following September.

That summer Anderson was subpoenaed by the Senate Select Committee to Investigate Improper Activities in Labor-Management Relations, then commonly called the McClellan Committee. Its Chief Counsel was Robert F. Kennedy. The Committee at that time was conducting an investigation of James R. Hoffa, President of the Teamsters Union. Kennedy had charged that Riss, as the owner of a large trucking operation, was a close personal friend of Hoffa and that as a result of this friendship Riss was able to obtain union contracts highly favorable to himself. Specifically, reference was made to an amendment in the Riss-Teamsters contract in 1956 (effecting the replacement of fringe benefits by a flat mileage rate) and it was suggested

---

1. The plaintiff also named the two corporations as defendants on the theory that Riss was acting as their representative when the alleged defamation took place. The trial court found against the plaintiff on this agency issue and entered judg- ment in favor of both corporations. The plaintiff has taken no appeal from that portion of the judgment. The case as it reaches us concerns only the individuals Anderson and Riss.

that the employees did not have an opportunity to vote on the amendment prior to its acceptance by the Union. In response to the counter-charge that the employees in fact had approved it, the Committee subpoenaed Anderson and other drivers. Anderson testified before the Committee on July 10 that the contract applied to him but that he did not vote on it and did not have an opportunity to vote on it. One other former driver and Riss also testified on the same day before the Committee.

Sometime prior to September 15, 1959, Kennedy was interviewed on a television program, entitled "Insight", emanating from Station WDAF-TV in Kansas City, Missouri. In that interview Kennedy commented about Riss and his relationship with Hoffa. The station thereafter invited Riss to appear on the same program. He accepted. The resulting interview, placed on video tape the afternoon of September 15 and broadcast by the television station that evening, has given rise to this lawsuit.

The 30-minute program followed no written script and was unrehearsed. It began:

"Announcer: Insight, an off-the-cuff interrogation of the man in the news by Editors Walt Bodine and Bill Leeds.

"Mr. Bodine: Good evening. Our guest on Insight tonight is a man whose name many of you may have seen many times on the sign across huge trucks on the road.—RISS— Mr. Richard R. Riss, Sr., President and Board Chairman of Riss & Company and Transport Manufacturing & Equipment. Mr. Riss is a man of enterprise and action, whose willingness to take a chance and to have faith in his own ideas enabled him to start from scratch as a railroad yardmaster's son from Poplar Bluff, Missouri, and to build one of the nation's largest trucking concerns.

"On the other hand he has been in the news as a witness before the Senate Rackets Committee, whose counsel, Robert Kennedy, sought to show a profitable friendship of Mr. Riss with the Teamster Chief Jimmy Hoffa. Well what is he really like, and what is his side of the story? Perhaps you will have a better insight into that after this visit tonight.

"Mr. Leeds: Mr. Riss, Bob Kennedy has accused you of being able to negotiate agreements advantageous to your company because of your friendship with Jimmy Hoffa. Would you care to comment on that?

"Mr. Riss: Yes, I would like to say that Mr. Kennedy doesn't know what he is talking about. * * *"

Riss then told about his personal friendship with Hoffa, defended it, stated that Hoffa's word was good and that he drove a tough bargain, explained the 1956 changes in his Teamsters contract, and asserted that they were voted upon by the Union membership. Then came the first statement complained of:

"Mr. Leeds: Didn't one of the drivers involved, Mr. Ardith Anderson, testify before the Committee— he said the Union members didn't like the change, didn't vote on it and saw nothing in writing about it. Do you know where he might have got that impression?

"Mr. Riss: Mr. Anderson is one of the two gentlemen that has been discharged from our company. Mr. Anderson, I believe, is the man that claimed he was sick and was not working on his truck. We told him to bring us a doctor's certificate to prove he was sick, or to bring the truck in. Instead of that he went down to the garage and took a lot of parts off of his truck. We ordered him to replace them. He didn't do it, so we let him go.

"Mr. Leeds: But Mr. Anderson did testify he didn't get a chance to vote on the changes in 1956. That was the point I was getting at.

"Mr. Riss: I don't know if Mr. Anderson was in our employ at the

time that was made or not, but if he testified to the fact he did not get a chance to vote on it he is certainly mistaken. * * * "

Riss went on to defend his method of leasing equipment to his drivers. He told why he thought Hoffa was a good and successful head of his union. He described his own attitude toward Mr. Kennedy and his techniques as counsel for the Committee. The interview ended with this question and answer:

"Mr. Bodine: During this hearing, during the famous McCarthy hearings in the past, there was a lot of discussion whether a witness gets a 'fair shake'. Were you allowed to speak your piece fully, or I mean, were you able to make any statement you wanted, and so on?

"Mr. Riss: No, I say, I don't know whether I was able to or not. The only one remark I did make, one thing, Mr. Kennedy says, 'I think that you and Mr. Hoffa have gone—have worked—framed up a deal, and that you did it for your own benefits against the members' interests.' And my lawyer wouldn't let me answer him, so all I said to him is, 'Is that what you think, Mr. Kennedy?' And then towards the very last Mr. Kennedy says, 'If you will stick around, Mr. Riss, we will show you what your employees think.' And I didn't know who he had subpoenaed, and I said, 'Mr. Kennedy, do you have some employees that I discharged or do you have some of my regular employees?' And it so happened that the only two employees he had were two that had been discharged, both of them for stealing. He subpoenaed twelve, I understand he subpoenaed twelve of our drivers. Ten of them were going to testify to the truth, so he wouldn't use them."

Riss testified in the trial court that after he returned to Kansas City from Washington he was told that two drivers formerly employed by him had also testified at the Committee hearing. He inquired at his office as to their record,

"who they were and what about them." He conceded "They told me the names. I didn't especially remember the names. It is hard for me to remember names. But I was told that one of them had taken a truck, refused to bring it back; the other had taken parts". He further conceded that he had this information when he appeared on "Insight" on September 15. He acknowledged that his comment on the program about Anderson's discharge "was not true, I was mistaken * * * I was wrong about Mr. Anderson being the man who took parts off the truck. There was another driver who took parts off the truck, did the things I accused Mr. Anderson of". He also acknowledged that he recognized Anderson and that Anderson had been in his office but "we have so many boys come in the office".

Anderson testified in the trial court that he had not removed parts from his tractor, that he had not been discharged from his Riss employment for stealing, that his connection with Riss ceased upon the settlement of the negotiated controversy and the termination of the owner-operator lease arrangements, and that the statements made by Riss were false.

Anderson also testified that he was out on the road at the time of the broadcast; that he first heard about it when he telephoned his wife a day or two later and she told him she had seen it; that upon his return to Kansas City he and his wife went to the television station and asked that the broadcast be played back for them to hear; that this was done; that he was embarrassed and humiliated; that 40 or 50 persons had brought the matter of the broadcast up with him; that among these were employees and former employees of Riss, the Andersons' dentist, their milkman, casual acquaintances, relatives, neighbors, and friends; that he was outraged and humiliated to think that his wife and children should be subjected to an accusation of stealing; and that he telephoned his then employer "because I was afraid he might think that I actually was a thief, which is an embarrassing thing

to have to do, to call a man on the phone and start to tell him my side of the story".

Mrs. Anderson testified that she heard the program; that when she told her husband about it they "were just terribly hurt about it. The children were upset"; that friends brought the matter up; and that people still asked about it occasionally.

Anderson conceded that he suffered, as a consequence, no loss of employment or earnings; that he and his family were still living at the same address they had prior to the broadcast; that people who mentioned the program to him still treated him the same as before; and that he noticed no difference in their relationship toward him. Mrs. Anderson also conceded that prior friendships continued.

There was evidence that WDAF-TV broadcasts covered 60 to 70 miles around Kansas City; that it was difficult to determine a given program's ratings; that it might be about 3% or 4% of the coverage area's 610,000 sets; but that it "could be considerably less or could be considerably more".

The plaintiff's complaint made no attempt to characterize Riss' challenged remarks specifically as libel or as slander. The trial court, in his informal findings and conclusions announced from the bench, held that the publication by way of tape and subsequent broadcast, to the extent it was untruthful, constituted li-

bel; that some actual malice was shown; that actual damage was not substantial; and that, because of the presence of "total irresponsibility", punitive damages were in order. The damages described in the first paragraph of this opinion were then awarded.

Both parties have assumed and declared that Missouri law governs. We do not pass upon the accuracy of that legal conclusion.[2] The trial court in his pronouncement from the bench made no reference to any conflict of laws question, cited no authority, and made no indication that he was applying anything other than Missouri law. In view of this state of the record we decide this case in the light of that law.

■ *The Missouri law.* Missouri has a statute, V.A.M.S. § 559.410, which defines libel:

"A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse * * *."

Section 559.430 imposes the requirement of publication:

"No printing, writing or other thing is a libel unless there has been a publication therof, by delivering, selling, reading or otherwise com-

2. With the Andersons residing in Kansas it could possibly be inferred that Mrs. Anderson and at least some of the family's friends and acquaintances who spoke to them of the broadcast had viewed the program from television sets in the State of Kansas. The record, however, does not show this and in fact contains nothing as to reception situs. If Kansas reception had been pleaded and proved, then perhaps, by Missouri conflicts principles, Hall Motor Freight v. Montgomery, 1948, 357 Mo. 1188, 212 S.W.2d 748, 753, 2 A.L.R.2d 1292, the law of Kansas, being the state where the last event in the alleged defamation process took place, would have application to the appropriate extent. Gaston v. Wabash R. R. Co., Mo. Sup., 1959, 322 S.W.2d 865, 867; Hughes

Provision Co. v. La Mear Poultry & Egg Co., Mo.App., 1951, 242 S.W.2d 285, 288; Restatement of the Law of Conflict of Laws, § 377, Note 5. This is on the theory that the governing law is that of the place where the wrong was committed and that defamation takes place where the defamatory statement is communicated and not necessarily in the place from which it originates. Howser v. Pearson, D.D.C., 1951, 95 F.Supp. 936, 938; Hartmann v. Time, Inc., 3 Cir., 1947, 166 F.2d 127, 133–135, 1 A.L.R.2d 370, cert. den., 334 U.S. 838, 68 S.Ct. 1495, 92 L. Ed. 1763. Compare Dale System v. General Teleradio, S.D.N.Y., 1952, 105 F. Supp. 745, 747–749; Nagoya Associates v. Esquire, Inc., S.D.N.Y., 1961, 191 F. Supp. 379, 382.

municating the same or causing the same to be delivered, sold, read or otherwise communicated to one or more persons or to the party libeled, or by exposing or exhibiting such libelous thing or matter in some public place, or where it may be seen or observed by the public."

These sections comprise a part of Missouri's criminal code. Nevertheless, § 559.410 (and its predecessor in prior revisions) has been held applicable to civil cases. Coots v. Payton, 1955, 365 Mo. 180, 280 S.W.2d 47, 53; Hylsky v. Globe Democrat Pub. Co., 1941, 348 Mo. 83, 152 S.W.2d 119, 122; Sotham v. Drovers Telegram Co., 1912, 239 Mo. 606, 144 S.W. 428, 431; Marshall v. National Police Gazette Corp., 8 Cir., 1952, 195 F.2d 993, 995. The same has been said of § 559.430. Jacobs v. Transcontinental & Western Air, Inc., Mo.App.1947, 205 S.W.2d 887, 894, reversed on other grounds, 358 Mo. 674, 216 S.W.2d 523, 6 A.L.R.2d 1002; Wright v. Great Northern Ry. Co., Mo.App.1916, 186 S.W. 1085, 1087.[3]

We need not determine whether these Missouri criminal libel statutes provide the exclusive or only available definition of libel for civil cases,[4] or whether their definition is the same as that of the common law.[5] We accept the definition only as one which is applicable for this civil case.

■ Missouri also has a crime statute defining slander. V.A.M.S. § 559.400. In contrast to the libel sections, this has been said to define criminal slander only;

civil slander therefore continues in Missouri to be defined by the common law. Krup v. Corley, 1902, 95 Mo.App. 640, 69 S.W. 609, 612; Chambers v. National Battery Co., W.D.Mo.1940, 34 F.Supp. 834, 836.

■ Slander at the common law has been characterized in Missouri as " 'words falsely spoken which are injurious to the reputation of another,' " Butler v. Freyman, 1924, 216 Mo.App. 636, 260 S.W. 523, 525, and as " 'the speaking of base and defamatory words which tend to the prejudice of the reputation, office, trade, business or means of getting a living of another,' " accompanied, of course, by publication. Harbison v. Chicago, R. I. & P. Ry. Co., 1931, 327 Mo. 440, 37 S.W.2d 609, 616, 79 A.L.R. 1; Lonergan v. Love, 1941, 235 Mo.App. 1066, 150 S.W.2d 534, 537; Johnston v. Savings Trust Co. of St. Louis, Mo.Sup. 1933, 66 S.W.2d 113, 114.[6]

■ There can be no dispute at this date that in Missouri defamation (whether technically it is characterized as libel or as slander) in the form of falsely accusing another of an indictable crime is actionable per se. Cook v. Pulitzer Pub. Co., 1911, 241 Mo. 326, 145 S.W. 480, 484, 485 (libel); McKim v. Moore, 1922, 291 Mo. 697, 237 S.W. 773, 774 (slander); Childers v. Nesselroad, 1948, 357 Mo. 1218, 212 S.W.2d 727, 729 (libel); Williams v. Turnbull, Mo.App.1921, 232 S.W. 172, 173 (slander); Robinson v. Johnson, 8 Cir., 1917, 239 F. 671, 674 (libel). The cases are also clear as to the character of the crime which must be charged in

**3.** There may be some question, however, as to the sufficiency, for civil libel, of mere communication "to the party ·libeled" as described in § 559.430. Compare Bedell v. Richardson Lubricating Co., Mo.App., 1920, 226 S.W. 653, 656; Wright v. Great Northern Ry. Co., supra, Mo.App., 1916, 186 S.W. 1085, 1087, and Houston v. Woolley, 37 Mo.App. 15, 24, with Howard v. Wilson, 1917, 195 Mo.App. 532, 192 S.W. 473, 475–476, the dissent in Jacobs v. Transcontinental & Western Air, Inc., supra, Mo.App., 1947, 205 S.W.2d 887, 895–896, and the construction of Missouri law in Insurance Research Service v. Associates Finance Corp., M.D.Tenn., 1955, 134 F.Supp. 54, 59–60.

**4.** See Jacobs v. Transcontinental & Western Air, Inc., supra, p. 525 of 216 S.W. 2d, but compare Chambers v. National Battery Co., W.D.Mo., 1940, 34 F.Supp. 834, 836.

**5.** As is suggested by Kenworthy v. Journal Co., 1906, 117 Mo.App. 327, 93 S.W. 882, 885, and Skelley v. St. Louis & S. F. R. Co., 1913, 176 Mo.App. 156, 161 S.W. 877, 878.

**6.** See, also, V.A.M.S. § 537.105, not applicable here, which precludes a certain type of defamation action. Compare Farmers Educational and Cooperative Union etc. v. WDAY, 1959, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407.

order to invoke this rule. It has been said that where the crime is a felony the rule applies. Lightfoot v. Jennings, 1953, 363 Mo. 878, 254 S.W.2d 596, 599; Tilles v. Pulitzer Pub. Co., 1912, 241 Mo. 609, 145 S.W. 1143, 1149. Other cases make it clear, however, (a) that the crime charged need only be a misdemeanor, Starnes v. St. Joseph Ry., L., H. & P. Co., 1932, 331 Mo. 44, 52 S.W.2d 852, 854; Vaughn v. May, 1925, 217 Mo.App. 613, 274 S.W. 969, 971; Tincher v. National Life & Accident Ins. Co., 1940, 235 Mo. App. 663, 146 S.W.2d 663, 665–666; (b) that it need not be one involving moral turpitude, Boyce v. Wheeler, 1917, 197 Mo.App. 295, 195 S.W. 84, 87, and (c) that it must be one for which the punishment may be confinement in jail or in the penitentiary, Kirk v. Ebenhoch, 1945, 354 Mo. 762, 191 S.W.2d 643, 644; Priest v. Central States Fire Ins. Co., 1928, 223 Mo.App. 122, 9 S.W.2d 543, 544.

Specifically, the rule applies to a charge of perjury, Brown v. Publishers: George Knapp & Co., 1908, 213 Mo. 655, 112 S.W. 474, 481; Hall v. Brookshire, 1954, 364 Mo. 774, 267 S.W.2d 627, 630, and to a charge of theft, Callahan v. Ingram, 1894, 122 Mo. 355, 26 S.W. 1020, 1022; Carpenter v. Hamilton, 1904, 185 Mo. 603, 84 S.W. 863, 866; O'Shaughnessy v. Rogers, Mo.App., 1947, 202 S. W.2d 92, 93.

By saying that the defamation is "actionable per se", the Missouri courts use that phrase in the sense that there is no requirement of proof, or even of allegation, of special damages, rather than in the more confined sense of the statement being actionable on its face. Bray v. Callihan, 1900, 155 Mo. 43, 55 S.W. 865; Tincher v. National Life & Accident Ins. Co., supra, p. 666 of 146 S.W. 2d; Priest v. Central States Fire Ins. Co., supra, p. 544 of 9 S.W.2d. Further, so long as the statement charges the crime, it is not any less actionable per se because the words used do not, within themselves and standing alone, designate the person to whom they refer. It is the defamatory material itself rather than the identity of the person defamed which gives the defamation its per se quality. Connell v. A. C. L. Haase & Sons Fish Co., 1923, 302 Mo. 48, 257 S.W. 760, 765; National Refining Co. v. Benzo Gas Motor Fuel Co., 8 Cir., 1927, 20 F.2d 763, 767, 55 A.L.R. 406, cert. den. 275 U.S. 570, 48 S.Ct. 157, 72 L.Ed. 431. The case last cited states that whether a statement is defamatory per se and whether it applies to the particular plaintiff "are entirely distinct questions, and should not be confused."

With this Missouri law in mind, the respective positions of the parties come more into focus: Riss argues that his statements were not libelous, that if they were defamatory at all they were not slanderous per se, that actual damage must therefore be proved, and that neither actual nor legal or inferred malice was present. Anderson, on the other hand, argues that the statements were libelous, that at least they were slanderous per se, that damages are therefore presumed, and that proof of actual damage and of actual malice is unnecessary.

We conclude that on the facts of this case it is not necessary for us, as the parties to an extent have done, to review and wrestle with the historical development of the law of defamation and its twin torts of libel and slander, or to note the logical inconsistencies and odd results of the decided cases, or to make this case one of significance on the question of the impact of television upon the old and established principles of the law of defamation. See generally, as to all this, Prosser, The Law of Torts, (2d Ed. 1955), Chapter 19. Specifically, we feel that we need not consider (a) as a matter of apparent first impression in Missouri, whether television remarks, made essentially extemporaneously and admittedly without a script, lead in the direction of libel or in the direction of slander;[7] (b) whether the legal result is to

7. Compare Remington v. Bentley, S.D.N.Y., 1949, 88 F.Supp. 166, 169, with Shor v. Billingsley, Sup.Ct.1956, 4 Misc.2d 857, 158 N.Y.S.2d 476, and with the concurring

be any different when, although extemporaneous, the program is taped or otherwise recorded before or upon the broadcast;[8] or (c) whether a television picture, not of the plaintiff as the allegedly defamed person but only of the interviewers and the alleged defamer, can possibly qualify as libelous in Missouri when its defamatory character, if it is defamatory at all, is auditory and not visual.

With this approach and in the light of the established Missouri principles outlined above, we return to the facts of this case.

1. The first of the two allegedly defamatory statements concededly refers specifically to the plaintiff: "Mr. Anderson is one of the two gentlemen that have been discharged from our company. * * * Instead of that [bringing in a doctor's certificate] he went down to the garage and took a lot of parts off his truck. We ordered him to replace them. He didn't do it, so we let him go."

The defendant argues that to state that someone removed something from "his" truck cannot be an accusation of criminal conduct since one cannot steal from himself. The obvious answer to this is that the significance of the statement must lie in its context. The possessive pronoun is widely and loosely used in everyday language and it often does not designate ownership. "His truck", therefore, may well be understood to mean "the truck owned by me [Riss] which he [Anderson] uses". Furthermore, these words, coupled, as they are, with the statement that Anderson had been discharged for his refusal to replace the parts, certainly could warrant a conclusion that there was something reprehensible in taking the parts from the truck.

■ Nevertheless, we entertain doubt as to whether, standing alone, the statement that the plaintiff "took" the parts constitutes a charge of theft or larceny or is otherwise necessarily defamatory. It is true that accusation of a crime need not be uttered with the precision of an indictment or other formal accusation. Brown v. Publishers: George Knapp & Co., supra, p. 484 of 112 S.W.; Connell v. A. C. L. Haase & Sons Fish Co., supra, p. 764 of 257 S.W. But there are Missouri cases with closely analogous fact situations indicating that an accusation that one has "taken" property does not in itself constitute the charge of a crime. Boyce v. Wheeler, 1912, 161 Mo.App. 504, 144 S.W. 119; Williams v. Turnbull, supra, p. 173 of 232 S.W.; Sitts v. Daniel, Mo.App.1926, 284 S.W. 857, 860. Compare Fenn v. Kroger Grocery & Baking Co., Mo.Sup., 1919, 209 S.W. 885. The

opinion of Judge Fuld in Hartmann v. Winchell, 1947, 296 N.Y. 296, 73 N.E.2d 30, 32–34, 171 A.L.R. 759. See Restatement of the Law of Torts, § 568 and comment f.

8. See and compare Sorensen v. Wood, 1932, 123 Neb. 348, 243 N.W. 82, 85, 82 A.L.R. 1098, appeal dismissed 290 U.S. 599, 54 S.Ct. 209, 78 L.Ed. 527; Hartmann v. Winchell, supra, p. 32 of 73 N.E.2d; Gearhart v. WSAZ, Inc., E.D.Ky., 1957, 150 F.Supp. 98, 112, affirmed WSAZ, Inc., v. Lyons, 6 Cir., 254 F.2d 242; Charles Parker Co. v. Silver City Crystal Co., 1955, 142 Conn. 605, 116 A.2d 440, 443; Polakoff v. Hill, 1941, 261 App.Div. 777, 27 N.Y.S.2d 142, 144; Hryhorijiv v. Winchell, Sup.Ct., 1943, 180 Misc. 574, 575, 45 N.Y.S.2d 31, affirmed, 267 App. Div. 817, 47 N.Y.S.2d 102; and Landau v. Columbia Broadcasting System, Sup.Ct., 1954, 205 Misc. 357, 128 N.Y.S.2d 254,

257, with Locke v. Gibbons, Sup.Ct., 1937, 164 Misc. 877, 299 N.Y.S. 188, 192–193, affirmed 253 App.Div. 887, 2 N.Y.S.2d 1015, and Meldrum v. Australian Broadcasting Co. [1932] Vict.L.Rep. 425, 438–439, [1932] Aust.L.Rep. 452. See also Young v. New Mexico Broadcasting Co., 1956, 60 N.M. 475, 292 P.2d 776; Lynch v. Lyons, 1939, 303 Mass. 116, 20 N.E.2d 953; and Coffey v. Midland Broadcasting Co., W.D.Mo., 1934, 8 F.Supp. 889.

The problem has been recognized but its resolution avoided in Nichoff v. Congress Square Hotel Co., 1954, 149 Me. 412, 103 A.2d 219, 220; Kelly v. Hoffman, Ct.Err. & App., 1948, 137 N.J.L. 695, 61 A.2d 143, 145–146, 5 A.L.R.2d 951; Irwin v. Ashurst, 1938, 158 Or. 61, 74 P.2d 1127, 1129–1130; Summit Hotel Co. v. National Broadcasting Co., 1939, 336 Pa. 182, 8 A.2d 302, 124 A.L.R. 968; and Miles v. Louis Wasmer, Inc., 1933, 172 Wash. 466, 20 P.2d 847.

trial judge also evidently entertained some hesitation at this point and we join him in not being willing to rest our decision on this first statement alone.

2. This leads us to a consideration of the statements contained in the very last part of the television broadcast, perhaps fifteen or twenty minutes after the first statement had been uttered. This later language, " * * * the only two employees he [Kennedy] had were two that had been discharged, both of them for stealing. He subpoenaed twelve * * * ten of them were going to testify to the truth so he didn't use them", manifestly charges theft and perjury[9] on the part of the two persons and thus, whether it be libel or slander, was defamatory per se under Missouri law.

Riss' real argument here is one of identity and is that the statement is not directed to Anderson, does not refer to him, does not identify him in connection with it, follows a quantity of intervening material not concerned with Anderson, and affords no understandable connection with the first statement containing the specific reference to Anderson.

We do not agree. The fact of Anderson's testifying before the Committee was twice stated in questions asked by the interrogator in the first portion of the program. This was known to Riss without any doubt. Four times, in that portion, Anderson's name was used. Further, prior to the broadcast Riss had inquired at his office about Anderson's record and who the two men who had testified in Washington "were and what about them" and he conceded that "I

inquired and found out". Riss had seen Anderson in his office and recognized him. The specific charge of stealing, in the last portion of the television interview is directed to two employees, one as to a truck and one as to parts, and to those very two, one of whom was Anderson, which Mr. Kennedy "had" as witnesses for the investigating committee. The specific charge of perjury is directed against the same two employees. Although Anderson is not named in the terminal portion of the broadcast, we think it would be unrealistic indeed to regard the latter portion of the program so sufficiently severed and isolated from the former as to provide Riss a defense based on lack of proof of identity of the plaintiff Anderson with one of the two persons referred to in the stealing and perjury charges. We reach this conclusion whether we apply the clearly erroneous standard of Rule 52(a), F.R.Civ. P. 28 U.S.C.A., which we deem applicable here, or whether we were to pass upon the matter independently as Riss urges us to do, assuming, within the concept of St. Louis Union Trust Co. v. Finnegan, 8 Cir., 1952, 197 F.2d 565, 568, and United States v. Mississippi Valley Barge Line Co., 8 Cir., 1960, 285 F.2d 381, 388, and cases cited, that there were no conflict in the evidence or in the inferences which reasonably can be drawn therefrom.

There is also ample evidence in the record testimony of Anderson and of Mrs. Anderson as to the former's identification for television viewers as the subject of the Riss charges. The standard is whether the charging statement

---

9. No point seems to have been raised as to perjury's qualification as a crime to which, in Missouri, the rule of defamation per se has application. The provisions of V.A.M.S. §§ 557.010 and 557.020 clearly demonstrate its qualification. But the question here is not whether the testimony claimed to be false would be perjury in Missouri, had it been uttered there, but whether it was perjury in the District of Columbia, where it was given. In other words, the offense charged must constitute a crime at the place where it is alleged

to have been committed. Furlong v. German-American Press Ass'n, Mo.Sup.1916, 189 S.W. 385, 388. See Lightfoot v. Jennings, supra, 1953, 363 Mo. 878, 254 S.W.2d 596, 599. That the testimony with which we are concerned would, if false, constitute perjury in the District of Columbia is apparent from pertinent provisions of both the United States Code and the District of Columbia Code. 2 U.S.C.A. § 191; 18 U.S.C.A. § 1621; D.C. Code, § 22–2501.

can be reasonably understood to apply to the plaintiff. Coats v. News Corp., 1946, 355 Mo. 778, 197 S.W.2d 958, 961. That standard was met.

3. Riss' argument that the trial court erred in finding malice necessarily falls with our conclusion that the charges were defamatory per se. Where there is defamation actionable per se and no question of privilege—and there is none here—there need be no proof of actual malice; malice is then presumed. Callahan v. Ingram, supra, p. 1024 of 26 S.W.; St. James Military Academy v. Gaiser, 1894, 125 Mo. 517, 28 S.W. 851, 853, 28 L.R.A. 667; Carpenter v. Hamilton, supra, p. 866 of 84 S.W.; Brown v. Publishers: George Knapp & Co., supra, p. 484 of 112 S.W. Malice, even though presumed, justifies the imposition of punitive damages by the trier of fact. Coats v. News Corp., supra, p. 963 of 197 S.W.2d.

4. We are not persuaded by the suggestion that there was nothing here other than a mistake in identity on Riss' part and that a finding of malice is unwarranted. This contention is refuted and the trial court's finding of malice is most adequately supported, wholly apart from the per se character of the defamation, by the facts noted above, that Anderson had been in Riss' office on more than one occasion, that Riss recognized him, that Riss on his return to Kansas City made inquiry about Anderson, that he learned of the settlement of the truck controversy, and that Riss identified the two drivers who had testified in Washington as having been discharged for stealing and as not being among the ten who "were going to testify to the truth". And the contention is entirely destroyed when one realizes that Riss' mistake, if any, was in associating Anderson with the stealing of truck parts rather than, as the sole available alternative, the stealing of a truck.

5. Although the amount of punitive damages allowed by the trial court here might be more than we would have been inclined to allow, had we been

the trier of fact, their amount lies wholly within the trier's discretion. Seested v. Post Printing & Publishing Co., 1930, 326 Mo. 559, 31 S.W.2d 1045, 1054. In any event, we do not regard the allowance here as an abuse of that discretion or as monstrous and we therefore do not disturb it. Solomon Dehydrating Co. v. Guyton, 8 Cir., 1961, 294 F.2d 439, 446–448, cert. den. 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192. Compare the results reached in Seested v. Post Printing & Publishing Co., supra, p. 1054 of 31 S.W.2d; Edwards v. Nulsen, 1941, 347 Mo. 1077, 152 S.W.2d 28, 32; Reese v. Fife, Mo.Sup., 1925, 279 S.W. 415; and Brown v. Globe Printing Co., 1908, 213 Mo. 611, 112 S.W. 462.

Affirmed.